Justice Sotomayor
delivered the opinion of the Court.
The Indian Self-Determination and Education Assistance Act (ISDA or Act), 25 U. S. C. § 450 et seq., directs the Secretary of the Interior to enter into contracts with willing tribes, pursuant to which those tribes will provide services such as education and law enforcement that otherwise would have been provided by the Federal Government. ISDA mandates that the Secretary shall pay the full amount of “contract support costs” incurred by tribes in performing their contracts. At issue in this case is whether the Government must pay those costs when Congress appropriates sufficient funds to pay in full any individual contractor’s contract support costs, but not enough funds to cover the aggregate amount due every contractor. Consistent with longstanding principles of Government contracting law, we hold that the Government must pay each tribe’s contract support costs in full.
I
A
Congress enacted ISDA in 1975 in order to achieve “maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as *186 to render such services more responsive to the needs and desires of those communities.” 25 U. S. C. § 450a(a). To that end, the Act directá the Secretary of the Interior, “upon the request of any Indian tribe . . . , to enter into a self-determination contract... to plan, conduct, and administer” health, education, economic, and social programs that the Secretary otherwise would have administered. § 450f(a)(1).
As originally enacted, ISDA required the Government to provide contracting tribes with an amount of funds equivalent to those that the Secretary “would have otherwise provided for his direct operation of the programs.” § 106(h), 88 Stat. 2211. It soon became apparent that this secretarial amount failed to account for the full costs to tribes of providing services. Because of “concern with Government’s past failure adequately to reimburse tribes’ indirect administrative costs,” Cherokee Nation of Okla. v. Leavitt, 543 U. S. 631, 639 (2005), Congress amended ISDA to require the Secretary to contract to pay the “full amount” of “contract support costs” related to each self-determination contract, §§ 450j-1(a)(2), (g).[1] The Act also provides, however, that “[Notwithstanding any other provision in [ISDA], the provision of funds under [ISDA] is subject to the availability of appropriations.” § 450j-1(b).
Congress included a model contract in ISDA and directed that each tribal self-determination contract “shall . . . contain, or incorporate [it] by reference.” § 450l(a)(1). The model contract specifies that “‘[s]ubject to the availability *187 of appropriations, the Secretary shall make available to the Contractor the total amount specified in the annual funding agreement’ ” between the Secretary and the tribe. § 450Z(c) (model agreement § 1(b)(4)). That amount “‘shall not be less than the applicable amount determined pursuant to [§450j-1(a)],’ ” which includes contract support costs. Ibid.; § 450j-l(a)(2). The contract indicates that “ ‘[e]ach provision of [ISDA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor . . . § 450Z(c) (model agreement § 1(a)(2)). Finally, the Act makes clear that if the Government fails to pay the amount contracted for, then tribal contractors are entitled to pursue “money damages” in accordance with the Contract Disputes Act. § 450m-l(a).
B
During Fiscal Years (FYs) 1994 to 2001, respondent Tribes contracted with the Secretary of the Interior to provide services such as law enforcement, environmental protection, and agricultural assistance. The Tribes fully performed. During each FY, Congress appropriated a total amount to the Bureau of Indian Affairs (BIA) “for the operation of Indian programs.” See, e. g., Department of the Interior and Belated Agencies Appropriations Act, 2000,113 Stat. 1501A-148. Of that sum, Congress provided that “not to exceed [a particular amount] shall be available for payments to tribes and tribal organizations for contract support costs” under ISDA. E. g., ibid. Thus, in FY 2000, for example, Congress appropriated $1,670,444,000 to the BIA, of which “not to exceed $120,229,000” was allocated for contract support costs. Ibid.
During each relevant FY, Congress appropriated sufficient funds to pay in full any individual tribal contractor’s contract support costs. Congress did not, however, appropriate sufficient funds to cover the contract support costs due all tribal contractors collectively. Between FYs 1994 and 2001, appropriations covered only between 77% and 92% of tribes’ *188 aggregate contract support costs. The extent of the shortfall was not revealed until each FY was well underway, at which point a tribe’s performance of its contractual obligations was largely complete. See 644 F. 3d 1054, 1061 (CA10 2011). Lacking funds to pay each contractor in full, the Secretary paid tribes’ contract support costs on a uniform, pro rata basis. Tribes responded to these shortfalls by reducing ISDA services to tribal members, diverting tribal resources from non-ISDA programs, and forgoing opportunities to contract in furtherance of Congress’ self-determination objective. GAO, V. Rezendes, Indian Self-Determination Act: Shortfalls in Indian Contract Support Costs Need to Be Addressed 3-4 (GAO/RCED-99-150, 2009).
Respondent Tribes sued for breach of contract pursuant to the Contract Disputes Act, 41 U. S. C. §§ 601-613, alleging that the Government failed to pay the full amount of contract support costs due from FYs 1994 through 2001, as required by ISDA and their contracts. The United States District Court for the District of New Mexico granted summary judgment for the Government. A divided panel of the United States Court of Appeals for the Tenth Circuit reversed. The court reasoned that Congress made sufficient appropriations “legally available” to fund any individual tribal contractor’s contract support costs, and that the Government’s contractual commitment was therefore binding. 644 F. 3d, at 1063-1065. In such cases, the Court of Appeals held that the Government is liable to each contractor for the full contract amount. Judge Hartz dissented, contending that Congress intended to set a maximum limit on the Government’s liability for contract support costs. We granted certiorari to resolve a split among the Courts of Appeals, 565 U. S. 1104 (2012), and now affirm.[2]
*189 I—!
A
In evaluating the Government’s obligation to pay tribes for contract support costs, we do not write on a clean slate. Only seven years ago, in Cherokee Nation, we also considered the Government’s promise to pay contract support costs in ISDA self-determination contracts that made the Government’s obligation “subject to the availability of appropriations.” 543 U. S., at 634-637. For each FY at issue, Congress had appropriated to the Indian Health Service (IHS) a lump sum between $1,277 and $1,419 billion, “far more than the [contract support cost] amounts” due under the Tribes’ individual contracts. Id., at 637; see id., at 636 (Cherokee Nation and Shoshone-Paiute Tribes filed claims seeking $3.4 and $3.5 million, respectively). The Government contended, however, that Congress had appropriated inadequate funds to enable the IHS to pay the Tribes’ contract support costs in full, while meeting all of the agency’s competing fiscal priorities.
As we explained, that did not excuse the Government’s responsibility to pay the Tribes. We stressed that the Government’s obligation to pay contract support costs should be treated as an ordinary contract promise, noting that ISDA “uses the word ‘contract’ 426 times to describe the nature of the Government’s promise.” Id., at 639. As even the Government conceded, “in the case of ordinary contracts ... ‘if the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment even if the agency has allocated the funds to another purpose or assumes other obligations that exhaust the funds.’ ” Id., at 641. It followed, therefore, that absent “something special about the promises here at issue,” the Government was obligated to pay the Tribes’ contract support costs in full. Id., at 638.
*190 We held that the mere fact that ISDA self-determination contracts are made “subject to the availability of appropriations” did not warrant a special rule. Id., at 643 (internal quotation marks omitted). That commonplace provision, we explained, is ordinarily satisfied so long as Congress appropriates adequate legally unrestricted funds to pay the contracts at issue. See ibid. Because Congress made sufficient funds legally available to the agency to pay the Tribes’ contracts, it did not matter that the BIA had allocated some of those funds to serve other purposes, such that the remainder was insufficient to pay the Tribes in full. Rather, we agreed with the Tribes that “as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue,” the Government’s promise to pay was binding. Id., at 637-638.
Our conclusion in Cherokee Nation followed directly from well-established principles of Government contracting law. When a Government contractor is one of several persons to be paid out of a larger appropriation sufficient in itself to pay the contractor, it has long been the rule that the Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends. See Ferris v. United States, 27 Ct. Cl. 542, 546 (1892); Dougherty v. United States, 18 Ct. Cl. 496, 503 (1883); see also 2 GAO, Principles of Federal Appropriations Law, p. 6-17 (2d ed. 1992) (hereinafter GAO Redbook).[3] That is so “even if an agency’s total lump- *191 sum appropriation is insufficient to pay all the contracts the agency has made.” Cherokee Nation, 543 U. S., at 637. In such cases, “[t]he United States are as much bound by their contracts as are individuals.” Lynch v. United States, 292 U. S. 571, 580 (1934) (internal quotation marks omitted). Although the agency itself cannot disburse funds beyond those appropriated to it, the Government’s “valid obligations will remain enforceable in the courts.” GAO Redbook, p. 6-17.
This principle safeguards both the expectations of Government contractors and the long-term fiscal interests of the United States. For contractors, the Ferris rule reflects that when “a contract is but one activity under a larger appropriation, it is not reasonable to expect the contractor to know how much of that appropriation remains available for it at any given time.” GAO Redbook, p. 6-18. Contractors are responsible for knowing the size of the pie, not how the agency elects to slice it. Thus, so long as Congress appropriates adequate funds to cover a prospective contract, contractors need not keep track of agencies’ shifting priorities and competing obligations; rather, they may trust that the Government will honor its contractual promises. Dougherty, 18 Ct. Cl., at 503. In such cases, if an agency over-commits its funds such that it cannot fulfill its contractual commitments, even the Government has acknowledged that “[t]he risk of over-obligation may be found to fall on the agency,” not the contractor. Brief for Federal Parties in Cherokee Nation v. Leavitt, O. T. 2004, No. 02-1472 etc., p. 24 (hereinafter Brief for Federal Parties).
The rule likewise furthers “the Government’s own long-run interest as a reliable contracting partner in the myriad workaday transaction of its agencies.” United States v. Winstar Corp., 518 U. S. 839, 883 (1996) (plurality opinion). If the Government could be trusted to fulfill its promise to *192 pay only when more pressing fiscal needs did not arise, would-be contractors would bargain warily—if at all—and only at a premium large enough to account for the risk of nonpayment. See, e. g., Logue, Tax Transitions, Opportunistic Retroactivity, and the Benefits of Government Precommitment, 94 Mich. L. Rev. 1129, 1146 (1996). In short, contracting would become more cumbersome and expensive for the Government, and willing partners more scarce.
B
The principles underlying Cherokee Nation and Ferris dictate the result in this case. Once “Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of ‘insufficient appropriations,’ even if the contract uses language such as ‘subject to the availability of appropriations,’ and even if an agency’s total lump-sum appropriation is insufficient to pay all the contracts the agency has made.” Cherokee Nation, 543 U. S., at 637; see also id., at 638 (“[T]he Government denies none of this”).
That condition is satisfied here. In each FY between 1994 and 2001, Congress appropriated to the BIA a lump sum from which “not to exceed” between $91 and $125 million was allocated for contract support costs, an amount that exceeded the sum due any tribal contractor. Within those constraints, the ability to direct those funds was “ ‘committed to agency discretion by law.’” Lincoln v. Vigil, 508 U. S. 182, 193 (1993) (quoting 5 U. S. C. § 701(a)(2)). Nothing, for instance, prevented the BIA from paying in full respondent Ramah Navajo Chapter’s contract support costs rather than other tribes’, whether based on its greater need or simply because it sought payment first.[4] See International Union, United Auto., Aerospace & Agricultural Implement Work *193 ers of Am. v. Donovan, 746 F. 2d 855, 861 (CADC 1984) (Scalia, J.) (“A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit”). And if there was any doubt that that general rule applied here, ISDA’s statutory language itself makes clear that the BIA may allocate funds to one tribe at the expense of another. See § 450j-1(b) (“[T]he Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this [Act]”). The upshot is that the funds appropriated by Congress were legally available to pay any individual tribal contractor in full. See 1 GAO Redbook, p. 4-6 (3d ed. 2004).
The Government’s contractual promise to pay each tribal contractor the “full amount of funds to which the contractor [was] entitled,” § 450j-l(g), was therefore binding. We have expressly rejected the Government’s argument that “the tribe should bear the risk that a total lump-sum appropriation (though sufficient to cover its own contracts) will not prove sufficient to pay all similar contracts.” Cherokee Nation, 543 U. S., at 638. Rather, the tribal contractors were entitled to rely on the Government’s promise to pay because they were “not chargeable with knowledge” of the BIA’s administration of Congress’ appropriation, “nor [could their] legal rights be affected or impaired by its maladministration or by its diversion.” Ferris, 27 Ct. Cl., at 546.
As in Cherokee Nation, we decline the Government’s invitation to ascribe “special, rather than ordinary,” meaning to the fact that ISDA makes contracts “subject to the availability of appropriations.”[5] 543 U. S., at 644. Under our previ *194 ous interpretation of that language, that condition was satisfied here because Congress appropriated adequate funds to pay in full any individual contractor. It is important to afford that language a “uniform interpretation” in this and comparable statutes, “lest legal uncertainty undermine contractors’ confidence that they will be paid, and in turn increase the cost to the Government of purchasing goods and services.” Ibid. It would be particularly anomalous to read the statutory language differently here. Contracts made under ISDA specify that “ ‘[e]ach provision of [ISDA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor . . . .’” § 450l(c) (model agreement § 1(a)(2)). The Government, in effect, must demonstrate that its reading is clearly required by the statutory language. Accordingly, the Government cannot back out of its contractual promise to pay each Tribe’s full contract support costs.
Ill
A
The Government primarily seeks to distinguish this case from Cherokee Nation and Ferris on the ground that Congress here appropriated “not to exceed” a given amount for contract support costs, thereby imposing an express cap on the total funds available. See Brief for Petitioners 26, 49. The Government argues, on this basis, that Ferris and Cherokee Nation involved “contracts made against the backdrop of unrestricted, lump-sum appropriations,” while this case does not. See Brief for Petitioners 49, 26.
That premise, however, is inaccurate. In Ferris, Congress appropriated “[f]or improving Delaware River below Bridesburg, Pennsylvania, forty-five thousand dollars.” 20 Stat. 364. As explained in the Government’s own appropriations law handbook, the “not to exceed” language at issue in this case has an identical meaning to the quoted language in Ferris. See GAO Redbook, p. 6-5 (“Words like ‘not to exceed’ are not the only way to establish a maximum limita *195 tion. If the appropriation includes a specific amount for a particular object (such as ‘For Cuban cigars, $100’), then the appropriation is a maximum which may not be exceeded”). The appropriation in Cherokee Nation took a similar form. See, e. g., 108 Stat. 2527-2528 (“For expenses necessary to carry out . . . [ISDA and certain other enumerated Acts], $1,713,052,000”). There is no basis, therefore, for distinguishing the class of appropriation in those cases from this one. In each case, the agency remained free to allocate funds among multiple contractors, so long as the contracts served the purpose Congress identified.
This result does not leave the “not to exceed” language in Congress’ appropriation without legal effect. To the contrary, it prevents the Secretary from reprogramming other funds to pay contract support costs—thereby protecting funds that Congress envisioned for other BIA programs, including tribes that choose not to enter ISDA contracts. But when an agency makes competing contractual commitments with legally available funds and then fails to pay, it is the Government that must bear the fiscal consequences, not the contractor.
B
The dissent attempts to distinguish this case from Cherokee Nation and Ferris on different grounds, relying on §450j-l(b)’s proviso that “the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe.” In the dissent’s view, that clause establishes that each dollar allocated by the Secretary reduces the amount of appropriations legally available to pay other contractors. In effect, the dissent understands § 450j-l(b) to make the legal availability of appropriations turn on the Secretary’s expenditures rather than the sum allocated by Congress.
That interpretation, which is inconsistent with ordinary principles of Government contracting law, is improbable. We have explained that Congress ordinarily controls the *196 availability of appropriations; the agency controls whether to make funds from that appropriation available to pay a contractor. See Cherokee Nation, 543 U. S., at 642-643. The agency’s allocation choices do not affect the Government’s liability in the event of an underpayment. See id., at 641 (when an “‘unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment even if the agency has allocated the funds to another purpose’ ”).[6] In Cherokee Nation, we found those ordinary principles generally applicable to ISDA. See id., at 637-646. We also found no evidence that Congress intended that “the tribe should bear the risk that a total lump-sum appropriation (though sufficient to cover its own contracts) will not prove sufficient to pay all similar contracts.” Id., at 638 (citing Brief for Federal Parties 23-25). The dissent’s reading, by contrast, would impose precisely that regime. See post, at 204-206.
The better reading of §450j-l(b) accords with ordinary Government contracting principles. As we explained, supra, at 190-192, the clause underscores the Secretary’s discretion to allocate funds among tribes, but does not alter the Government’s legal obligation when the agency fails to pay. That reading gives full effect to the clause’s text, which ad *197 dresses the “amount of funds provided,” and specifies that the Secretary is not required to reduce funding for one tribe to make “funds available” to another. 450j-l(b). Indeed, even the Government acknowledges the clause governs the Secretary’s discretion to distribute funds. See Brief for Petitioners 52 (pursuant to § 450j-l(b), the Secretary was not obligated to pay tribes’ “contract support costs on a first-come, first-served basis, but had the authority to distribute the available money among all tribal contractors in an equitable fashion”).
At minimum, the fact that we, the court below, the Government, and the Tribes do not share the dissent’s reading of § 450j-1(b) is strong evidence that its interpretation is not, as it claims, “unambiguous[ly]” correct. Post, at 207 (opinion of Roberts, C. J.). Because ISDA is construed in favor of tribes, that conclusion is fatal to the dissent.
C
The remaining counterarguments are unpersuasive. First, the Government suggests that today’s holding could cause the Secretary to violate the Anti-Deficiency Act, which prevents federal officers from “mak[ing] or authorizing] an expenditure or obligation exceeding an amount available in an appropriation.” 31 U. S. C. § 1341(a)(1)(A). But a predecessor version of that Act was in place when Ferris and Dou-gherty were decided, see GAO Redbook, pp. 6-9 to 6-10, and the Government did not prevail there. As Dougherty explained, the Anti-Deficiency Act’s requirements “apply to the official, but they do not affect the rights in this court of the citizen honestly contracting with the Government.” 18 Ct. Cl., at 503; see also Ferris, 27 Ct. Cl., at 546 (“An appropriation per se merely imposes limitations upon the Government’s own agents;.. . but its insufficiency does not pay the Government’s debts, nor cancel its obligations”).[7]
*198 Second, the Government argues that Congress could not have intended for respondents to recover from the Judgment Fund, 31 U. S. C. § 1304, because that would allow the Tribes to circumvent Congress’ intent to cap total expenditures for contract support costs.[8] That contention is puzzling. Congress expressly provided in ISDA that tribal contractors were entitled to sue for “money damages” under the Contract Disputes Act upon the Government’s failure to pay, 25 U. S. C. §§ 450m-1(a), (d), and judgments against the Government under that Act are payable from the Judgment Fund, 41 U. S. C. § 7108(a) (2006 ed., Supp. IV).[9] Indeed, we cited the Contract Disputes Act, Judgment Fund, and Anti-Deficiency Act in Cherokee Nation, explaining that if the Government commits its appropriations in a manner that leaves contractual obligations unfulfilled, “the contractor [is] free to pursue appropriate legal remedies arising because the Government broke its contractual promise.” 543 U. S., at 642.
Third, the Government invokes cases in which courts have rejected contractors’ attempts to recover for amounts beyond the maximum appropriated by Congress for a particular purpose. See, e. g., Sutton v. United States, 256 U. S. 575 (1921). In Sutton, for instance, Congress made a specific line-item appropriation of $23,000 for the completion of a par *199 ticular project. Id., at 577. We held that the sole contractor engaged to complete that project could not recover more than that amount for his work.
The Ferris and Sutton lines of cases are distinguishable, however. GAO Redbook, p. 6-18. “[I]t is settled that contractors paid from a general appropriation are not barred from recovering for breach of contract even though the appropriation is exhausted,” but that “under a specific line-item appropriation, the answer is different.” Ibid.[10] The different results “follo[w] logically from the old maxim that ignorance of the law is no excuse.” Ibid. “If Congress appropriates a specific dollar amount for a particular contract, that amount is specified in the appropriation act and the contractor is deemed to know it.” Ibid. This ease is far different. Hundreds of tribes entered into thousands of independent contracts, each for amounts well within the lump sum appropriated by Congress to pay contract support costs. Here, where each Tribe’s “contract is but one activity under a larger appropriation, it is not reasonable to expect [each] contractor to know how much of that appropriation remain[ed] available for it at any given time.” Ibid.; see also Ferris, 27 Ct. Cl., at 546.
Finally, the Government argues that legislative history suggests that Congress approved of the distribution of available funds on a uniform, pro rata basis. But “a fundamental principle of appropriations law is that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear infer *200 ence arises that it does not intend to impose legally binding restrictions.” Lincoln, 508 U. S., at 192 (internal quotation marks omitted). “[I]ndicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on the agency.” Ibid, (internal quotation marks omitted). An agency’s discretion to spend appropriated funds is cabined only by the “text of the appropriation,” not by Congress’ expectations of how the funds will be spent, as might be reflected by legislative history. International Union, UAW, 746 F. 2d, at 860-861. That principle also reflects the same ideas underlying Ferris. If a contractor’s right to payment varied based on a future court’s uncertain interpretation of legislative history, it would increase the Government’s cost of contracting. Cf. Cherokee Nation, 543 U. S., at 644. That long-run expense would likely far exceed whatever money might be saved in any individual case.
> hH
As the Government points out, the state of affairs resulting in this case is the product of two congressional decisions which the BIA has found difficult to reconcile. On the one hand, Congress obligated the Secretary to accept every qualifying ISDA contract, which includes a promise of “full” funding for all contract support costs. On the other, Congress appropriated insufficient funds to pay in full each tribal contractor. The Government’s frustration is understandable, but the dilemma’s resolution is the responsibility of Congress.
Congress is not short of options. For instance, it could reduce the Government’s financial obligation by amending ISDA to remove the statutory mandate compelling the BIA to enter into self-determination contracts, or by giving the BIA flexibility to pay less than the full amount of contract support costs. It could also pass a moratorium on the formation of new self-determination contracts, as it has done *201 before. See § 328, 112 Stat. 2681-291 to 2681-292. Or Congress could elect to make line-item appropriations, allocating funds to cover tribes’ contract support costs on a contractor-by-contractor basis. On the other hand, Congress could appropriate sufficient funds to the BIA to meet the tribes’ total contract support cost needs. Indeed, there is some evidence that Congress may do just that. See H. R. Rep. No. 112-151, p. 42 (2011) (“The Committee believes that the Bureau should pay all contract support costs for which it has contractually agreed and directs the Bureau to include the full cost of the contract support obligations in its fiscal year 2013 budget submission”).
The desirability of these options is not for us to say. We make clear only that Congress has ample means at hand to resolve the situation underlying the Tribes’ suit. Any one of the options above could also promote transparency about the Government’s fiscal obligations with respect to ISDA’s directive that contract support costs be paid in full. For the period in question, however, it is the Government—not the Tribes—that must bear the consequences of Congress’ decision to mandate that the Government enter into binding contracts for which its appropriation was sufficient to pay any individual tribal contractor, but “insufficient to pay all the contracts the agency has made.” Cherokee Nation, 543 U. S., at 637.
The judgment of the Court of Appeals is affirmed.

It is so ordered.

 As defined by ISDA, contract support costs “shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which . . . (A) normally are not carried on by the respective Secretary in his direct operation of the program; or (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.” §450j-l(a)(2). Such costs include overhead administrative costs, as well as expenses such as federally mandated audits and liability insurance. See Cherokee Nation of Okla., 543 U. S., at 635.

 Compare 644 F. 3d 1054 (case below) with Arctic Slope Native Assn., Ltd. v. Sebelius, 629 F. 3d 1296 (CA Fed. 2010) (no liability to pay total contract support costs beyond cap in appropriations Act).

 In Ferris, for instance, Congress appropriated $45,000 for the improvement of the Delaware River below Bridesburg, Pennsylvania. Act of Mar. 3, 1879, ch. 181, 20 Stat. 364. The Government contracted with Ferris for $37,000 to dredge the river. Halfway through Ferris’ performance of his contract, the United States Army Corps of Engineers ran out of money to pay Ferris, having used $17,000 of the appropriation to pay for other improvements. Nonetheless, the Court of Claims found that Ferris could recover for the balance of his contract. As the court explained, the appropriation “merely impose[d] limitations upon the Government’s own agents; ... its insufficiency [did] not pay the Government’s debts, nor cancel its obligations, nor defeat the rights of other parties.” 27 Ct. Cl., *191 at 546; see also Dougherty, 18 Ct. Cl., at 503 (rejecting Government’s argument that a contractor could not recover upon similar facts because the “appropriation had, at the time of the purchase, been covered by other contracts”).

 Indeed, the IHS once allocated its appropriations for new ISDA contracts on a first-come, first-serve basis. See Dept, of Health and Human Services, Indian Self-Determination Memorandum No. 92-2, p. 4 (Feb. 27, 1992).

 The Government’s reliance on this statutory language is particularly curious because it suggests it is superfluous. See Brief for Petitioners 30-31 (it is “unnecessary” to specify that contracts are “subject to the availability of appropriations” (internal quotation marks omitted)); see also Reply Brief for Petitioners 7 (“[A]ll government contracts are contingent upon the appropriations provided by Congress”).

 The dissent’s view notwithstanding, it is beyond question that Congress appropriated sufficient unrestricted funds to pay any contractor in full. The dissent’s real argument is that §450j-1(b) reverses the applicability of the Ferris rule to ISDA, so that the Secretary’s allocation of funds to one contractor reduces the legal availability of fends to others. See post, at 204 (opinion of Roberts, C. J.) (“[T]hat the Secretary could have allocated the fends to [a] tribe is irrelevant. What matters is what the Secretary actually does, and once he allocates the fends to one tribe, they are not ‘available’ to another”). We are not persuaded that § 450j—1(b) was intended to enact that radical departure from ordinary Government contracting principles. Indeed, Congress has spoken clearly and directly when limiting the Government’s total contractual liability to an amount appropriated in similar schemes; that it did not do so here further counsels against the dissent’s reading. See, e. g., 25 U. S. C. § 2008( j)(2) (“If the total amount of funds necessary to provide grants to tribes ... for a fiscal year exceeds the amount of fends appropriated . . . , the Secretary shall reduce the amount of each grant [pro rata]”).

 We have some doubt whether a Government employee would violate the Anti-Deficiency Act by obeying an express statutory command to enter a contract, as was the case here. But we need not decide the ques *198 tion, for this case concerns only the contractual rights of tribal contractors, not the consequences of entering into such contracts for agency employees.

 The Judgment Fund is a “permanent, indefinite appropriation” enacted by Congress to pay final judgments against the United States when, inter alia, “[pjayment may not legally be made from any other source of funds.” 31 CFR § 256.1(a)(4) (2011).

 For that reason, the Government’s reliance on Office of Personnel Management v. Richmond, 496 U. S. 414 (1990), is misplaced. In Richmond, we held that the Appropriations Clause does not permit plaintiffs to recover money for Government-caused injuries for which Congress “appropriated no money.” Id., at 424. Richmond, however, indicated that the Appropriations Clause is no bar to recovery in a case like this one, in which “the express terms of a specific statute” establish “a substantive right to compensation” from the Judgment Fund. Id., at 432.

 Of course, “[t]he terms ‘lump-sum’ and ‘line-item’ are relative concepts.” GAO Redbook, p. 6-165. For example, an appropriation for building two ships “could be viewed as a line-item appropriation in relation to the broader ‘Shipbuilding and Conversion’ category, but it was also a lump-sum appropriation in relation to the two specific vessels included.” Ibid. So long as a contractor does not seek payment beyond the amount Congress made legally available for a given purpose, “[t]his factual distinction does not affect the legal principle.” Ibid. See also In re Newport News Shipbuilding & Dry Dock Co., 55 Comp. Gen. 812 (1976).