# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 9, 2016          Decided April 4, 2017

No. 16-5117

NAVAJO NATION, A FEDERALLY RECOGNIZED INDIAN TRIBE,
NAVAJO NATION DEPARTMENT OF JUSTICE,
APPELLANT

v.

UNITED STATES DEPARTMENT OF THE INTERIOR AND
RYAN ZINKE, IN HIS OFFICIAL CAPACITY AS SECRETARY,
UNITED STATES DEPARTMENT OF THE INTERIOR,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01909)

---

*Steven D. Gordon* argued the cause for appellant. With him on the briefs were *Philip Baker-Shenk* and *Jessica Farmer*.

*John S. Koppel*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *Mark R. Freeman*, Attorney.

Before: KAVANAUGH and PILLARD, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

SENTELLE, *Senior Circuit Judge*:   The Navajo Nation delivered a proposed funding agreement to the Bureau of Indian Affairs, an agency within the United States Department of the Interior, during a partial government shutdown.  By law, the BIA had 90 days after receipt to act on the proposal or it would be deemed approved.  The BIA did not consider the proposal "received" until normal government operations later resumed, and issued a partial declination 90 days after that date.  The Nation filed an action to enforce the proposal, contending that the BIA's declination was untimely.  The district court granted summary judgment to the DOI, holding that because the Nation had remained silent when the BIA indicated its position on the deadline, the Nation was equitably estopped from asserting an earlier one.  The Nation brought the present appeal.  We reverse the judgment.

## I. BACKGROUND

Congress enacted the Indian Self-Determination and Education Assistance Act ("ISDEAA") to help Indian tribes assume responsibility for programs or services that a federal agency would otherwise provide to the tribes' members.  25 U.S.C. §§ 5301 *et seq.*  The transfer of authority from the Department of the Interior ("DOI") to a tribe is memorialized in a "self-determination contract."  The ISDEAA includes a model contract specifying a multi-year term, with the funding amount for each year to be determined during subsequent negotiations and incorporated through annual funding agreements.  *Id.* § 5329(c).  When a tribe submits a proposed annual funding agreement to DOI, "the Secretary shall, within ninety days after

receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification" to the tribe that the proposal is declined for one of five reasons provided by the statute. *Id.* § 5321(a)(2). "[T]he Secretary may extend or otherwise alter the 90-day period . . . if before the expiration of such period, the Secretary obtains the voluntary and express written consent of the tribe" to do so. *Id.* "A proposal that is not declined within 90 days (or within any agreed extension . . .) is deemed approved . . . ." 25 C.F.R. § 900.18.

In 2012, DOI Secretary Sally Jewell entered into a self-determination contract under the ISDEAA whereby the federal government would fund the Navajo Nation's ("the Nation") judicial operations from January 1, 2012 through December 31, 2016. The contract requires the parties to negotiate a separate funding agreement for each calendar year that it covers.

On October 4, 2013, the Nation hand-delivered a proposal to Raymond Slim, an ISDEAA Specialist in the Self-Determination Office in the Bureau of Indian Affairs ("BIA") Navajo Regional Office. Slim marked it for intra-office mail delivery to Jeanette Quintero, a BIA official that the BIA claims is responsible for making award and declination decisions for the Nation's contracts under the ISDEAA. However, Quintero was furloughed at that time pursuant to a partial government shutdown caused by a lapse in congressional appropriations. Quintero returned to work on October 17, 2013, when normal governmental operations resumed, and apparently received the proposal on that date.

On October 21, 2013—two business days after normal government operations resumed—the BIA sent a letter to the Nation acknowledging its receipt of the proposal. The letter stated that, due to the government shutdown, the BIA considered

the proposal to have been received on October 17, 2013. The letter asserted that the BIA had until "90 days after October 17, 2013 to approve, decline, or award the proposal," and that this "90-day period will end on *January 15, 2014*." (emphasis in original). The letter directed the Nation to contact Quintero or her colleague Frances Price if it had any questions. The Nation did not respond to this letter.

On November 7, 2013, the BIA sent another letter to the Nation, this time identifying substantial changes between the proposal and the CY 2013 annual funding agreement, including the fact that the Nation's requested budget amount had increased from about $1.3 million to over $17 million. The letter requested that the Nation respond to the BIA's concerns by November 29, 2013, so that the BIA could complete its review of the proposal, and stated that the BIA would "hold the approval" of the proposal until the Nation submitted the requested documents. The letter directed the Nation to contact Quintero, Price, or their colleague Daniel Largo, Jr., if it had any questions. The Nation did not respond to this letter.

If the proposal was properly "received" on the date it was hand-delivered (October 4), rather than on the date government operations resumed (October 17), then the 90-day window for the Secretary to act on it closed on January 2, 2014, rather than January 15 as asserted by the BIA. But the BIA neither approved nor denied the proposal by January 2, 2014, nor did it ever receive the Tribe's "express written consent" to an extension of time within which to do so.

On January 9, 2014, the BIA sent a letter to the Nation requesting a 45-day extension to the 90-day window. The BIA stated that it was requesting the extension so that the Nation could have additional time to respond to the issues raised in the BIA's November 7 letter. Again, the letter directed the Nation

to contact Quintero, Price, or Largo with any questions. The Nation did not respond to this letter.

On January 15, 2014—according to the BIA, the last day of the 90-day window—the BIA sent the Nation a letter partially declining the proposal. The BIA authorized approximately $1.3 million in funding rather than the approximately $17 million requested.

On January 27, 2014, the Nation sent the BIA a letter asserting that the 90-day review window had actually closed on January 2, 2014—*i.e.*, 90 days after the Nation delivered the proposal to the Regional Office. The letter stated that the BIA's partial declination was therefore untimely and that the proposal was automatically deemed approved as a matter of law.

On February 7, 2014, the BIA sent the Nation a letter explaining that the partial declination was timely because delivery of the proposal to Slim did not constitute receipt by the Secretary as Slim was only authorized to perform work for contracts relating to road construction during the partial shutdown. The BIA contended that during the partial shutdown no BIA employee was authorized to receive or work on the Nation's proposal, so the 90-day review period did not begin until the authorized employees returned to work on October 17, 2013.

The Nation filed the instant action in November 2014 seeking to enforce the proposal. The district court denied the Nation's motion for summary judgment and granted the BIA's cross-motion for summary judgment, finding that because the Nation was silent in response to the BIA's letters announcing its position on the deadline for action, the Nation was equitably estopped from asserting an earlier deadline. The Nation appealed.

## II. DISCUSSION

### A. Receipt

The BIA asserts that the Nation's proposal was not "received" by the agency on October 4, 2013, notwithstanding that, on that day, the Nation hand-delivered the proposal to an agency employee at the BIA's Navajo Regional Office. Although the district court did not reach this question, it is nonetheless appropriate for this Court to resolve it. *See Proctor v. State Farm Mut. Auto. Ins. Co.*, 675 F.2d 308, 325-26 (D.C. Cir. 1982) (citing *Singleton v. Wulff*, 428 U.S. 106 (1976)).

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Assn. v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (internal quotation marks omitted). The word "receive" is not defined in the ISDEAA. Considering the plain meaning of the word, it is difficult to escape the conclusion that Slim's unconditional acceptance of the Nation's proposal hand-delivered to him on October 4, 2013, constituted receipt on that day. *See* Webster's Third New Int'l Dictionary 1894 (3d ed. 2002) (defining "to receive" as "to take possession or delivery of" or "to admit or accept in some character or capacity").

DOI's "Internal Agency Procedures Handbook for Non-Construction Contracting Under Title I of the [ISDEAA]" ("Handbook") notes that the 90-day deadline for action begins upon "receipt by the agency." The Handbook defines "agency" as "the individual operating divisions or bureaus of . . . the DOI," including "offices." The Handbook, then, suggests that a proposal's arrival at any BIA office constitutes receipt. A subsequent section titled "Receipt of Initial Contract Proposal" also supports this straightforward reading by suggesting that

"receipt" immediately precedes the date-stamping of a proposal upon "arriv[al] in any office." Indeed, the Handbook notes that the BIA is required to respond within 90 days of receipt even by an office without the authority to process proposals. *See Yurok Tribe v. United States Dep't of Interior*, 785 F.3d 1405, 1410-11 (Fed. Cir. 2015) (rejecting the government's argument that a proposal must be sent to a particular office within the BIA).

DOI asserts that Slim was legally incapable of accepting the proposal on behalf of the Secretary during the partial shutdown due to the Anti-Deficiency Act (the "Act"). The Act expressly prohibits agencies from incurring obligations in excess of appropriations, including the employment of federal personnel during a lapse in appropriations, such as a shutdown. 31 U.S.C. §§ 1341(a), 1342. Only excepted or exempted employees may work during a shutdown. Excepted employees are employees who are authorized to work on specific assignments to protect human life and property. *Id.* § 1342. Exempted employees are those whose salaries are paid out of a source of funding other than annual appropriations and therefore are not implicated by the Act. *See Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations*, 43 U.S. Op. Atty. Gen. 293, 298 (1981); *see also* BIA Contingency Plan Q&A Document (Sept. 27, 2013).

According to DOI, there were no excepted or exempted employees in the BIA's Navajo Regional Office authorized to receive or work on ISDEAA contracts during the government shutdown. Slim, exempt from the Act because his salary was funded from multi-year appropriations, was "specifically authorized to receive or work on contracts related to road construction" but could not "work on contracts such as the Navajo Nation's . . . ." DOI asserts that because no source of appropriated funds was available for Slim to receive the proposal on behalf of the Secretary during the partial shutdown,

it would have been a violation of the Act for him to do so. But DOI concedes that Slim was permitted to engage in the "*de minimis* non-exempt function[]" of "marking the CY 2014 proposal for intra-office mail delivery." DOI does not explain how he could have so processed a document not yet received.

Nevertheless, DOI argues, Slim lacked the authority to "receive" the proposal on behalf of the Secretary; thus, it contends, his acceptance of the proposal did not trigger the regulatory deadlines at issue in this case. However, while "the Anti-Deficiency Act's requirements 'apply to the official, . . . they do not affect the rights in this court of the citizen honestly contracting with the Government.'" *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2193 (2012) (quoting *Dougherty v. United States*, 18 Ct. Cl. 496, 503 (1883)). For example, although the Act prohibits a government agency from incurring obligations in excess of appropriations, if the agency nevertheless obligates itself to spend in excess of appropriations, it does not cancel the agency's obligations nor defeat the rights of other parties. *Salazar*, 132 S. Ct. at 2193 (citing *Ferris v. United States*, 27 Ct. Cl. 542, 546 (1892)); *see also Wetsel-Oviatt Lumber Co. v. United States*, 38 Fed. Cl. 563, 570 (1997) (holding that the Act will not "shield the government from liability where the government has lawfully entered into a contract with another party"). Likewise, even if Slim violated the Act by accepting the Navajo Nation's proposal, the agency is nonetheless bound by the consequences of him doing so. In short, even if DOI's position were otherwise correct, it would prove at most that its employee should not have received the document, not that he did not receive it.

## B. Equitable Principles

DOI alternatively asserts two equitable principles that it argues excuse any untimeliness. First, DOI argues that the

Navajo Nation is equitably estopped from disputing the timeliness of the declination after remaining silent in the face of the BIA's repeated assertions of its position on the matter. Second, DOI argues that equitable tolling of the 90-day deadline is appropriate for the period of the government shutdown. We disagree. Such equitable relief is inappropriate in this case.

Equitable doctrines are grounded in fairness and justice, *Anglo-Am. Sav. & Loan Ass'n v. Campbell*, 13 App. D.C. 581, 603-04 (D.C. Cir. 1898); *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996), and their application implies the occurrence of atypical circumstances. Equitable estoppel does not arise in this case. The government itself has consistently taken the position that estoppel does not apply against the sovereign United States. It thus ill-behooves the government to seek to impose such an uncommon action against another sovereign, especially one to which it owes a "distinctive obligation of trust." *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942). In its dealings with the Indians, the United States government "has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards." *Id.* at 297.

Nor does this case present the sort of "extraordinary circumstances" that justify equitable tolling. *See Menominee Tribe of Wis. v. United States*, 136 S. Ct. 750, 755 (2016) (holding that circumstances must be sufficiently "extraordinary" to support equitable tolling). Government stoppages are hardly unforeseeable. If the government believes it cannot "receive" documents during a stoppage, it should instruct its employees not to receive them, rather than expect its citizens and its courts to "equitably" pretend it has not done so. There is no evidence in the record that the BIA made any effort to prevent personnel

such as Slim from "receiving" proposals, or to inform tribes that it would not "receive" proposals during the shutdown.

DOI argues that the Court's holding will lead to "absurd result[s]"—for example, if a lapse in appropriations lasted longer than 90 days, any proposals "received" at offices without excepted or exempt employees authorized to decline them would be automatically deemed approved during the lapse. Again, DOI, not its clients, has the authority to instruct its own employees on what they cannot do. Further, in this case, the BIA lost only the first 13 of the 90 days it had to act on the proposal. DOI concedes that the BIA had sufficient time to review and respond to the proposal by asserting that "the BIA's declination analysis did not change after November 7" and the BIA "could have issued its declination decision at any time after November 7." Yet, inexplicably, it failed to do so. The Court will not reward DOI's lack of diligence in the name of "equity."

## C. Award Amount

Finally, DOI argues that even if the proposal is deemed approved, the Nation cannot be awarded funds in excess of the "Secretarial amount." When a proposal is deemed approved, "the Secretary shall award the contract or any amendment or renewal within that 90-day period and add to the contract the full amount of funds pursuant to section 106(a) of the [ISDEAA]." 25 C.F.R. § 900.18. DOI argues that because § 106(a) provides that the Secretary may decline a proposal if the amount of funds proposed "is in excess of the applicable funding level for the contract," 25 U.S.C. § 5321(a)(2)(D), the BIA cannot be required to award funding in excess of the amount of funds the BIA would otherwise have expended on the particular program or service for the tribe. In short, DOI seeks to transform the funding floor into a ceiling. This argument has been oft rejected. *See Yurok Tribe*, 785 F.3d at 1412 (noting

that the statute, "by its clear terms, sets a floor, not a ceiling, on the amount of money that a Tribe can receive in a self-determination contract"); *Seneca Nation of Indians v. United States Dep't of Health & Human Servs.*, 945 F. Supp. 2d 135, 150-51 (D.D.C. 2013) (noting that the § 106(a) or Secretarial amount is not immutable and can be increased by the Secretary). The cited portions of the ISDEAA do not "support the government's claim that self-determination contracts are limited to funding for programs the government currently provides to the requesting tribe." *Yurok Tribe*, 785 3d at 1412-13.

### III. CONCLUSION

For the reasons set forth above, the district court's decision denying the Navajo Nation's motion for summary judgment and granting the BIA's cross-motion for summary judgment is reversed.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring: I join the Court's opinion. I add this brief concurrence to explicitly state that equitable tolling may apply in certain government shutdown situations. The doctrine does not apply on the facts here, however, because the BIA had plenty of time after it reopened on October 16, 2013, to meet the 90-day statutory deadline at issue in this case.