# In the United States Court of Federal Claims

No. 07-725 C
(Filed: April 18, 2013)

```
*************************************
BRISTOL BAY AREA HEALTH          *
CORPORATION,                     *
                                 *      Indian Self-Determination and Education
              Plaintiff,         *      Assistance Act, 25 U.S.C. § 450
                                 *       ("ISDEAA"); RCFC 12(b)(1), 12(b)(6);
v.                               *      Contract Disputes Act, 41 U.S.C. § 7103;
                                 *      Tolling; Indirect Contract Support Costs;
THE UNITED STATES,               *      Res Judicata
                                 *
              Defendant.         *
*************************************
```

Geoffrey D. Strommer, Portland, OR, for plaintiff.

Joseph A. Pixley, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court is defendant's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff, Bristol Bay Area Health Corporation ("Bristol Bay") alleges that the government breached a statutory and contractual duty when it entered into contracts with plaintiff for plaintiff to provide health care services to tribal members but failed to pay plaintiff for certain costs from fiscal years ("FY") 1993 through 1999. In its motion, defendant raises three issues: (1) whether the six-year statute of limitations applicable to cases brought under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-09 (Supp. V 2012) ("CDA"), bars Bristol Bay's actions for breach of contract that accrued in FYs 1997 and 1998; (2) whether Bristol Bay is entitled to the additional costs it seeks beyond what the parties agreed to under the terms of the contracts; and (3) whether Bristol Bay's claim for breach of contract for FY 1995 is barred by res judicata because it, according to defendant, arises from the same transactional facts as a prior suit in federal court in Alaska, which was dismissed with prejudice pursuant to a settlement agreement between the government and Bristol Bay. For the reasons discussed below, defendant's motion to dismiss is denied.

## I.  BACKGROUND

### A.  The Indian Self-Determination and Education Assistance Act

Congress enacted the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450-458ddd (2012) ("ISDEAA") to allow federally-recognized Indian tribes and Alaska Native villages to contract with the federal government to operate many of the programs that the government previously operated for the benefit of the tribes and villages, through what is termed a self-determination contract.[1]  See 25 U.S.C. § 450a(b) (stating that the purpose of the ISDEAA is to "permit an orderly transition from Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.").  The Indian Health Service ("IHS"), an agency within the United States Department of Health and Human Services ("HHS"), was established to carry out the responsibilities, authorities, and functions of the government in providing health care services to Indians and Indian tribes, including Alaska Native villages.  Id. § 1661(a).  See id. § 1603(d) (defining "Indian tribe" to include Alaska Native villages).  IHS provides these programs either directly or through contracts with tribes or tribal organizations under the ISDEAA.  Id. § 1621(a)(4).

Section 450f(a)(1) of the ISDEAA directs the Secretary of HHS ("the Secretary"), "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof . . . ."  25 U.S.C. § 450f(a)(1).  If the parties are unable to agree on the appropriate funding level, the Secretary can decline the tribal contractor's proposal in part or in full.  The tribal contractor has the right to seek review of a declination either through the administrative appeals process or by a direct federal court action.  See id. § 450f(b).  There are two types of funding for each ISDEAA contract.  First, the ISDEAA contractor receives the amount the Secretary "would have otherwise provided for the operation of the programs" ("Secretarial amount"), which "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs."  Id. § 450j-1(a)(1).  Second, the contractor receives contract support costs ("CSC"), id. § 450j-1(a)(2), which are the subject of Bristol Bay's complaint and are discussed further below.

As originally enacted, the ISDEAA did not require the government to pay the administrative costs that the tribes incurred to operate the programs.  In many cases, contractors were forced to absorb those costs, thereby reducing the funds available for the tribes to provide direct services to their members.  See Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1080 (Fed. Cir. 2003); S.Rep. No. 100-274, at 8-9 (1987).  To remedy that problem, Congress amended the ISDEAA in 1988, to add a new section 106 that required the federal government to

---

[1]  Defendant's February 1, 2008 motion to dismiss will be cited as "Mot." and attached exhibits as "Def. Ex."; plaintiff's April 2, 2008 response will be cited as "Opp'n" and attached exhibits as "Pl. Ex."; plaintiff's March 14, 2011 response will be cited as "Opp'n 2"; defendant's May 5, 2011 reply will be cited as "Reply"; and plaintiff's May 13, 2011 surreply will be cited as "Surreply."

provide funds to pay the administrative expenses of covered programs.[2] Those expenses included CSC, which are defined in the statute as costs that a federal agency would not have directly incurred, but that tribal organizations acting as contractors reasonably incur in managing the programs. 25 U.S.C. § 450j-1(a)(2). Payment of CSC is required as follows:

> (2) There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which --
> (A) normally are not carried on by the respective Secretary in his direct operation of the program; or
> (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.
>
> (3) (A) The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of-
> (i) direct program expenses for the operation of the Federal program that is the subject of the contract, and
> (ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under section 106(a)(1).

Id. § 450j-1(a)(2), (3). "Upon approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under subsection (a)," as noted above. Id. § 450j-1(g).[3]

> The amount of funds required by § 450j-1(a):
>
> (1) shall not be reduced to make funding available for contract monitoring or administration by the Secretary;
>
> (2) shall not be reduced by the Secretary in subsequent years except pursuant to--
>
>> (A) a reduction in appropriations from the previous fiscal year for the program or function to be contracted;

---

[2] Indian Self-Determination Amendments of 1987, Pub. L. No. 100-472, § 205 (Oct. 5, 1988), codified at 25 U.S.C. § 450j-1.

[3] The Senate Report emphasizes full funding. See e.g., S. Rep. No. 100-274, at 12 ("The most relevant issue is the need to fully fund indirect costs associated with self-determination contracts."); id. at 13 ("Full funding of tribal indirect costs associated with self-determination contracts is essential if the federal policy of Indian Self-Determination is to succeed.").

(B) a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;

(C) a tribal authorization;

(D) a change in the amount of pass-through funds needed under a contract; or

(E) completion of a contracted project, activity, or program.

Id. § 450j-1(b)(1)-(2).

There are three categories of CSC: (1) direct CSC, which are administrative costs of the contracted-for program, such as unemployment taxes or workers' compensation insurance, see id. § 450j-1(a)(3)(A)(i), § 450b(c); (2) start-up costs for the initial year of the contract "consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis," id. § 450j-1(a)(5); and (3) indirect CSC, which are administrative costs that are shared by several different programs or services. See id. § 450j-1(a)(3)(A)(ii); id. § 450b(f). Only indirect CSC are at issue in this lawsuit. See Compl. ¶¶ 2, 15.

Every self-determination contract must contain or incorporate by reference the provisions of the "model agreement" prescribed by the ISDEAA and "such other provisions as are agreed to by the parties." 25 U.S.C. § 450l(a). The model agreement states that the contract shall attach and incorporate by reference an "annual funding agreement," or "AFA." Id. § 405l(c) (model agreement § 1(f)). The AFA sets forth the negotiated annual CSC amounts associated with the contract, id. (model agreement §§ 1(b)(4), 1(c), 1(f)(2)(A)), and the "time and method of payment," id. (model agreement § 1(f)(2)(A)(i)). It also reiterates that the Secretary's payment of amounts specified in the AFA is "subject to the availability of appropriations." Id. (model agreement § 1(b)(4)). The AFAs are renegotiated each year. Ramah Navajo Chapter v. Salazar, 644 F.3d 1054, 1060 (10th Cir. 2011), aff'd, 132 S.Ct. 2181 (2012); see also 25 U.S.C. § 450l(c) (model agreement §§ 1(b)(4), 1(b)(14)). The CSC amounts in the agreements, therefore, are likely to change over the course of multi-year contracts. See id. § 450j(c)(1).

### B. Bristol Bay's Allegations

Bristol Bay is a tribal organization that provides public health services to Alaska Natives and other eligible beneficiaries pursuant to ISDEAA agreements with IHS.[4] Compl. ¶¶ 1, 8. To provide such services, Bristol Bay entered into a self-determination contract under Title I of the ISDEAA for FYs 1993 and 1994 and into a self-governance compact and AFAs under Title III of the ISDEAA for FYs 1995 through 1999 of the ISDEAA.[5] Compl. ¶ 10. Bristol Bay alleges that

---

[4] For purposes of defendant's motion to dismiss, defendant accepts as true the factual allegations set forth in plaintiff's complaint. The court does the same for purposes of ruling on the motion.

[5] For the purposes of this action, there are no legal differences between Title I contracts and Title III compacts and AFAs. Title III specified that compacting Tribes were to receive the

IHS breached these agreements by underpaying it indirect CSC in FYs 1993 through 1999. Compl. ¶¶ 2, 15.

Bristol Bay states that for itself and for the vast majority of tribal contractors, the indirect CSC requirement for a given fiscal year is calculated by multiplying a negotiated indirect cost rate by the direct cost base.   The direct cost base, for the purpose of calculating indirect costs, is comprised of the "Secretarial" or program amount, less capital expenditures and pass-through funds, plus direct CSC.  See Def. Ex. G.  Bristol Bay asserts that this is the government's standard method, the method contemplated by Congress when it enacted section 106, and the principal method used and recognized by the IHS's own policies.  It also asserts that the government admitted as much in other litigation.  Opp'n 8 n.7 (citing Cherokee Nation v. Leavitt, 543 U.S. 631, 635 (2005)).  Further, Bristol Bay states that IHS agreed to calculate and pay indirect CSC in accordance with Indian Self-Determination Memorandum ("ISDM") 92-2 and Bristol Bay's indirect cost agreements.  See, e.g., Def. Ex. E § 4(b).  ISDM 92-2 provides that the amount of the indirect CSC to be paid "will be determined by applying the negotiated rate(s) to the direct cost base amount for this purpose."  Def. Ex. G § 5.B(1).

In its complaint, Bristol Bay alleges that IHS should have reprogrammed money from its lump sum appropriation to pay the difference between what was contained in the FY 1993 through 1997 AFAs, and what it claims is the "full amount" of indirect CSC, required by the ISDEAA.  Compl. ¶¶ 2, 15, 16-19, 27-32.  For FYs 1998 and 1999, Bristol Bay does not seek to recover the full documented shortfall for each year, but only the amount that IHS was required to pay but did not based on statutory and contractual obligations.  Id. ¶¶ 34-38.  In total, Bristol Bay seeks $9,132,576 for unpaid CSC, interest on that amount, and attorney fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and 25 U.S.C. § 450m-1(c).  Id. ¶ 39C.  Pursuant to the CDA, Bristol Bay requested a contracting officer's decision on its CSC claims on July 5, 2005, for FYs 1995 through 1999, and on its CSC claims on November 30, 2006, for FYs 1993 and 1994.  Compl. ¶¶ 5, 25.  IHS denied the claims for FYs 1995 and 1996 in letters dated April 20, 2007, and October 25, 2006, respectively.  Compl. ¶¶ 6, 25.  Bristol Bay alleges that because IHS has not issued a decision on the FY 1993, 1994, 1997, 1998, and 1999 claims within a reasonable time, they are deemed denied.[6]  Compl. ¶ 6.

---

same level of funding, including CSC, as they would have carrying out the same programs under Title I.  See 25 U.S.C. § 450f note.  Therefore, unless indicated otherwise, "contracts" includes Bristol Bay's Title I contracts and its Title III compacts and AFAs.  In 2000, Congress repealed Title III, and replaced it with the current Title V, in the Tribal Self-Governance Amendments of 2000, Pub. L. No. 106-260, 114 Stat. 711, codified at 25 U.S.C. § 458aaa.

[6] Defendant states that on April 20, 2007, IHS sent a letter to Bristol Bay, stating that it needed additional time to decide its claims.  On October 17, 2007, five days after Bristol Bay filed its complaint, the contracting officer denied Bristol Bay's claims for FYs 1997 and 1998. Defendant also states that the contracting officer has no record of sending a decision letter for the FY 1999 claim.  Regarding the FY 1993 and 1994 claims, the contracting officer extended the deadline in 2006 for 180 days, but the contracting officer has no record of sending a decision letter to Bristol Bay for those years.

## C. Procedural Background

Bristol Bay filed its complaint in this court on October 12, 2007. Defendant filed its motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) on February 1, 2008, and plaintiff filed its response on April 2, 2008. Shortly after, plaintiff also filed a motion for summary judgment. On May 9, 2008, defendant filed a motion to stay briefing on plaintiff's motion for summary judgment until the court ruled on defendant's motion to dismiss, and the court granted the motion to stay briefing.

On October 21, 2008, Bristol Bay filed a motion to stay proceedings pending a decision by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") on the issue of whether the CDA's statute of limitations, 41 U.S.C. § 7103, could be tolled or whether it was a jurisdictional requirement not subject to tolling.[7] Defendant, in its motion to dismiss, argued, amongst other things, that 41 U.S.C. § 7103 is jurisdictional and cannot be tolled. Plaintiff indicated that awaiting a decision from the Federal Circuit could prevent this court from possibly issuing a ruling at odds with the Federal Circuit. As such, plaintiff requested that this court enter a stay until the Federal Circuit issued a decision in one of the three pending appeals.[8] This court determined that judicial economy, as well as the parties' resources and energies, were best served by a stay in this case until the Federal Circuit rendered a decision regarding whether the statute of limitations contained at 41 U.S.C. § 7103 was jurisdictional. Accordingly, the court granted plaintiff's motion to stay proceedings.

On September 29, 2009, the Federal Circuit issued a decision in all three cases. Arctic Slope Native Ass'n v. Sebelius, 583 F. 3d 785 (Fed. Cir. 2009). While petitions for writ of certiorari to the United States Supreme Court ("Supreme Court") (No. 09-1172) were filed by two of the tribes, these were denied. In these cases, the tribes argued that the CDA's six-year presentment period was either subject to equitable tolling, or the period was legally tolled by the pendency of two class action lawsuits in which they were putative class members. Arctic Slope, 583 F.3d at 788. The Federal Circuit held that the six-year presentment period is subject to equitable tolling, but not class action, or legal, tolling. Id. Taking into account these decisions, the parties stated that the stay in this case should be lifted. On September 13, 2010, the court lifted the stay. The court then permitted supplemental briefing by the parties on defendant's motion to dismiss.

---

[7] The parties cite 41 U.S.C. § 605 in referring to the CDA. In 2011, Congress amended the CDA to "remove ambiguities, contradictions, and other imperfections," and recodified title 41 of the United States Code, Pub.L. No. 111-350, 124 Stat. 3677 (2011). As a result, citations in this opinion are to the current version of the CDA, which is now codified at 41 U.S.C. §§ 7101-09.

[8] The three cases were: Metlakatla Indian Cmty. v. Dep't of HHS, BCA 181-ISDA, 2008 WL 3052446 (July 28, 2008), appeal docketed, No. 2009-1004 (Fed. Cir. Oct. 6, 2008); Confederated Tribes of the Coos, Lower Umpqua & Siuslaw Indians v. Dep't of HHS, No. 08-2 BCA ¶ 33,922 (July 28, 2008), appeal docketed, No. 2008-1607 (Fed. Cir. Sept. 30, 2008); Arctic Slope Native Ass'n v. Leavitt, 08-2 BCA ¶ 33,923 (July 28, 2008), appeal docketed, No. 2008-1532 (Fed. Cir. Aug. 22, 2008).

## II.  LEGAL STANDARDS

### A.  Subject Matter Jurisdiction

Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); see also Matthews v. United States, 72 Fed. Cl. 274, 278 (2006) (stating that subject matter jurisdiction is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case"). "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941).  A waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969).  Thus, unless Congress consents to a cause of action against the United States, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." Sherwood, 312 U.S. at 587-88.

The Tucker Act confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012).  Although the Tucker Act waives the sovereign immunity of the United States for claims for money damages, it is only a jurisdictional statute.  United States v. Testan, 424 U.S. 392, 398 (1976).  Therefore, the Tucker Act "does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc portion).  The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc); accord Martinez v. United States, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) (en banc) (explaining that the Tucker Act waives sovereign immunity for actions brought pursuant to contracts with the government, actions to recover illegal exactions of money by the government, and actions brought pursuant to "money-mandating constitutional provisions, statutes, regulations, or executive orders").

### B.  RCFC 12(b)(1) Motion to Dismiss

When deciding a motion to dismiss, the court assumes all factual allegations set forth in the complaint are true and draws all reasonable inferences in the plaintiff's favor.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S.

800, 814-19 (1982); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006). Because the court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion," Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999), the court analyzes defendant's motion under RCFC 12(b)(1).

The burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it, see McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936), and a plaintiff must establish jurisdiction by a preponderance of the evidence, Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. When ruling upon a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## C. RCFC 12(b)(6) Motion to Dismiss

To survive a motion to dismiss pursuant to RCFC 12(b)(6), the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007). Moreover, the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citations omitted). In ruling on a RCFC 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiff. Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). However, in deciding whether to dismiss a complaint upon the basis of claim preclusion or res judicata under RCFC 12(b)(6), this court can consider prior court decisions and court filings between the same parties, which are matters of public record. See Biomedical Patent Management Corp. v. California, 505 F.3d 1328, 1342 (Fed. Cir. 2007) (district court did not abuse its discretion for taking judicial notice of several court filings from prior litigation between the parties); Curtis v. United States, 212 Fed. Appx. 991, 992 (Fed. Cir. 1991) (in dismissing plaintiff's breach of contract claim on claim preclusion grounds, the trial court took judicial notice of its prior decision involving the identical parties).

## D. Rules of Construction

Statutes enacted for the benefit of Indian tribes, such as the ISDEAA, must be liberally construed in their favor. Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985); Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32 (1943) (agreements with tribes to be liberally construed). The ISDEAA states that "[e]ach provision of the [ISDEAA] and each provision of this [self-determination] Contract shall be liberally construed for the benefit of the Contractor . . . ." 25 U.S.C. § 450l(c); see also S. Rep. No. 103-374, at 11 (1994) (stating that section 1(a)(2) of the model self-determination contract "incorporates the longstanding canon of statutory interpretation that laws enacted for the benefit of Indians are to be liberally construed in

their favor"). The compacts also reflect the liberal construction canon. See, e.g., FY 1995 Compact Art. I § 2 ("This Compact shall be liberally construed to achieve its purposes . . . ."); FY 1996 Compact Art. I § 2 (same); FY 1997 Compact Art. I § 2 (same). Therefore, any ambiguities in the contracts, as well as the ISDEAA, must be resolved in favor of Bristol Bay.

## III.  DISCUSSION

### A.  Defendant Argues That the Court Lacks Jurisdiction Over Plaintiff's Claim to Funds for FYs 1997 and 1998 Because the Statute of Limitations Has Expired

On July 17, 1996, and August 11 and 26, 1997, respectively, Bristol Bay entered into compacts and AFAs for FYs 1997 and 1998. See Def.'s Exs. A-D. Because these documents were signed after the implementation of the CDA's statute of limitations, 41 U.S.C. § 7103(a), this statute of limitations applies to the compacts and their related AFAs. Pursuant to 41 U.S.C. § 7103(a) for contracts entered into on or after October 1, 1995, a contractor has six years to bring a claim to a contracting officer following the date the claim accrued. Thus, defendant argues, a cause of action for breach of an ISDEAA contract accrues on the last day of the applicable contract year (which corresponds with the federal fiscal year). See Oceanic S.S. Co. v. United States, 165 Ct. Cl. 217, 225 (1964). Applying these principles, defendant argues that (1) Bristol Bay's claims under the FY 1997 contract accrued by the end of September 1997, and the statute of limitations on these claims expired by September 2003; and (2) Bristol Bay's claims under the FY 1998 contract accrued by the end of September 1998, and the statute of limitations on these claims expired by September 2004. Because Bristol Bay did not submit any of its claims for FY years 1997 and 1998 to the contracting officer until July 5, 2005, defendant contends that the court lacks subject matter jurisdiction over Bristol Bay's claims for FYs 1997 and 1998 because they fall outside of the CDA's six-year statute of limitations period. Thus, defendant argues that the court should dismiss these claims pursuant to RCFC 12(b)(1).

### 1.  Legal Tolling

In response to defendant's motion to dismiss, plaintiff initially argued that the government ignored the well-established rule that a class action tolls the statute of limitations as to members of the putative class. Citing precedent from the Supreme Court, plaintiff asserted that "'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.'" Opp'n 27 (quoting American Pipe & Constr. Co v. Utah, 414 U.S. 538, 554 (1974)). However, Bristol Bay conceded in its March 14, 2011 brief that the "[Arctic Slope, 583 F.3d at 785] decision forecloses the argument that Bristol Bay is entitled to mandatory legal tolling." Opp'n 2 at 8 n.4. Indeed, in Arctic Slope, the Federal Circuit held that "class action tolling is not available to parties . . . who have not made timely presentation of their claims to a contracting officer." 583 F.3d at 797. Like the contractors in Arctic Slope, Bristol Bay concedes that it did not file requests for a contracting officer's decision until 2005, and consequently, would not have been eligible for the class had it been certified. Opp'n 2 at 8 n.4. Therefore, Bristol Bay's FY 1997 and 1998 claims cannot be saved by the doctrine of legal tolling.

## 2. Equitable Tolling

Bristol Bay, however, does continue to argue that equitable tolling saves its FY 1997 and 1998 claims from dismissal. In support of its argument, plaintiff relies on the decision in Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95-96 (1990), wherein the Supreme Court held that a "presumption" of equitable tolling applies to suits against the United States even though a waiver of sovereign immunity is to be strictly construed. In response, the government contends that the statute of limitations for the CDA is jurisdictional and may not be waived.

While Irwin did not involve the CDA, it remains good law, and in Irwin, the Supreme Court held that, there is a presumption in favor of tolling which can be rebutted if tolling would not be applicable in a similar suit between private parties, or if Congress did not want tolling to apply. 498 U.S. at 95-96. Moreover, the Federal Circuit in Arctic Slope, 583 F.3d at 800, relying on Irwin, addressed the statute of limitations in 41 U.S.C. § 7103(a)(4) and whether the statute is subject to equitable tolling. The Federal Circuit opined: "[W]hile we agree with the government that class action tolling does not apply to the claims at issue in these cases, we do not agree that the limitations period in [§ 7103(a)(4)] is absolute and not subject to equitable tolling." Arctic Slope, 583 F.3d at 800. Therefore, Bristol Bay may in fact be entitled to equitable tolling.

Bristol Bay asserts that rebutting the Irwin presumption in favor of tolling requires positive evidence of congressional intent otherwise with respect to the particular statute at issue, and the text of the CDA reveals no indication that Congress intended to rebut the presumption in favor of equitable tolling. Plaintiff then contends that while it had addressed the legal reasons why tolling would apply under the CDA, it must be given the opportunity to address the factual basis of its tolling argument. Defendant concedes that Bristol Bay must be given the opportunity to address the factual basis of its equitable tolling argument, and is entitled to present factual evidence to address the tolling issue, but asserts that Bristol Bay has been afforded the opportunity to present evidence that would justify equitable tolling in this case.

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005) (citing Irwin, 498 U.S. at 96). Courts do not grant equitable tolling in circumstances where a plaintiff "knew or should have known" of a cause of action. Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988); see also Japanese War Notes Claimants Ass'n of Philippines v. United States, 373 F.2d 356, 359 (Ct. Cl. 1967) ("[i]gnorance of rights which should be known is not enough"). "Mere excusable neglect is not enough to establish a basis for equitable tolling." Martinez v. United States, 333 F.3d 1295, 1318 (Fed. Cir. 2003).

Here, the factual question of whether the equitable tolling standard has been met by the circumstances of this case has not been fully briefed. However, the court notes that Bristol Bay could have submitted evidence, in the form of affidavits, to support its equitable tolling argument in order to establish jurisdiction. See Cedar-Sinai Medical Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993) ("In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleading, but may review evidence extrinsic to the pleadings, including affidavits and

- 10 -

deposition testimony."). Thus, had Bristol Bay supplied affidavits or other evidence to support its contentions that equitable tolling applies here, the court could have ruled on this issue. Nonetheless, given the record before the court, the court cannot determine whether Bristol Bay is entitled to equitable tolling for FYs 1997 and 1998, and therefore requires additional briefing on this issue. Thus, the court declines to dismiss Bristol Bay's claims for FYs 1997 and 1998 under RCFC 12(b)(1).

**B. Defendant Argues that the Complaint Should be Dismissed Under RCFC 12(b)(6)**

Defendant next argues that Bristol Bay's claims for FYs 1993 through 1999 must be dismissed for failure to state a claim under RCFC 12(b)(6) because Bristol Bay seeks an additional amount of indirect CSC under the ISDEEA, above and beyond what was specified in the contracts. In addition, defendant contends that because Bristol Bay previously brought suit for the FY 1995 claim, and that case was dismissed with prejudice pursuant to a settlement agreement between the parties, Bristol Bay's claim for FY 1995 is barred by the doctrine of res judicata. Before turning to these arguments, the court addresses the scope of the documents it can review in ruling on a RCFC 12(b)(6) motion.

**1. The Court Can Consider Documents Other than the Complaint**

In deciding whether to dismiss a complaint under RCFC 12(b)(6), defendant argues that the court may consider the undisputed contract documents that are central to plaintiff's claim without converting defendant's motion to dismiss into one for summary judgment. Defendant provided with its motion relevant pages from the AFAs, other agreements, the ISDM 92-2, and documents from plaintiff's previous lawsuit. As defendant notes, RCFC 9(h)(3) requires that, as an attachment to its complaint, a plaintiff must include "a description of the contract sufficient to identify it" and "shall annex to the complaint a copy of the contract . . . ." Id. Bristol Bay alleges that the government breached certain agreements, but did not attach a copy of those agreements. Defendant further asserts that even in situations in which the "plaintiff is under no obligation to attach to her complaint documents upon which her action is based," the "defendant may introduce certain pertinent documents if the plaintiff failed to do so." Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993). Thus, defendant contends that the court may consult any documents that are contained or cited in the pleadings, without treating this motion as a summary judgment motion. Moreover, defendant asserts that: "'Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.'" Mot. 13 (quoting Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 48 (2nd Cir. 1991)).

In this case, the court need not convert defendant's motion to dismiss into a motion for summary judgment because, in addition to the requirement of RCFC 9(h)(3), it is well established that, in addition to the complaint itself and attached exhibits, the court "must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). Moreover, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which

renders the document integral to the complaint." Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2nd Cir. 2006); see also Perry v. New England Bus. Serv., Inc., 347 F.3d 343, 345 n.2 (1st Cir. 2003) ("Where . . . 'a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under [Fed. R. Civ. Proc.] 12(b)(6).'" (quoting Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998))). Because the AFAs and other agreements are central to Bristol Bay's allegations and are referenced in the complaint, see Compl. ¶¶ 1, 2, 3, 4, 8, 9, 10, 14, 35, 36, and because plaintiff does not dispute the authenticity of any of these documents, the court will consider them without converting the motion to dismiss into one for summary judgment. Moreover, "[i] n deciding whether to dismiss a complaint under Rule 12(b)(6), the court may consider matters of public record." See Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999) (citations omitted). Because the documents provided by the government are public documents and/or are matters of public record, the court is entitled to take judicial notice of their contents.

### 2. Defendant Argues that Bristol Bay Is Not Entitled to Additional CSC

Defendant asserts that Bristol Bay's complaint must be dismissed because it seeks an additional amount of indirect CSC outside of what was specified in the contracts. Defendant contends that while the amount of indirect CSC is subject to the availability of funding for each fiscal year, the agreed amount is expressly stated in the AFA per negotiation between the parties. Bristol Bay asserts that the government is bound by both statute and contract to pay its indirect CSC, and this obligation has been confirmed by the Supreme Court and other courts. It contends that the ISDEAA requires payment of a specific amount: the "full amount." In this case, the method agreed to by the parties was the application of the negotiated indirect cost rate. Plaintiff argues that according to the government, once the contract amounts are agreed upon, there can be no other measure of the amount owed, and these amounts, according to the government, supersede the statutory duty to pay full CSC as Congress intended. Plaintiff contends that the amounts added are justified from a government accounting perspective since the "full amount," i.e., the indirect cost rate amount, is the contract ceiling, and intermittent installment payments are made toward that amount. This practice, plaintiff claims, is in line with the rest of AFA section 4(b), which states that more indirect cost funding will be provided incrementally, as soon as available, and that the full amount to be paid will be based on Bristol Bay's indirect cost agreement. Def. Ex. E at A11.

In resolving the motion, the court first turns to the cases cited by the defendant. Defendant contends that Bristol Bay's allegation runs contrary to the Supreme Court's holding in Cherokee Nation, a case in which the Supreme Court mandated that an ISDEAA contract be treated as any other procurement contract, where the parties must rely on that contract's terms and conditions. Cherokee Nation, 543 U.S. at 643-45. Consequently, defendant claims that as a matter of law, the mere fact that the contracts were entered into pursuant to the ISDEAA does not entitle Bristol Bay to an additional amount of indirect CSC, beyond what the parties expressly agreed to in the AFAs. Further, according to defendant, the Federal Circuit in Samish Indian Nation v. United States, 419 F.3d 1355 (Fed. Cir. 2005), held that there is no independent right to CSC under the ISDEAA. See id. at 1365-67.

With respect to Samish, that case is inapposite because there, plaintiff sought to collect funds for ISDEAA contracts it never had, and the Federal Circuit's decision turned on the fact that plaintiff did not have a self-determination contract. Id. With respect to Cherokee Nation, the Supreme Court held that the government cannot avoid its contractual and statutory duties by claiming CSC funds were not available. 543 U.S. at 637. Bristol Bay points to the ISDEAA, citing the provision that states: "[N]o contract . . . entered into pursuant to Title I of this Act shall be construed to be a procurement contract." 25 U.S.C. § 450b(j). Indeed, the Supreme Court in Cherokee Nation did not strike down this provision. While the Supreme Court did find that ISDEAA agreements are as legally binding as procurement contracts, the Supreme Court did not suggest that the contract could trump the requirements of section 106 or in any other way imply that the government could shed its responsibilities. Cherokee Nation, 543 U.S. at 639.

Moreover, the arguments raised by the government have been raised previously and rejected. For instance, although Menominee Indian Tribe of Wis. v. United States, 539 F.Supp.2d 152, 155 (D.D.C. 2008), rev'd on other grounds, 614 F.3d 519 (D.C. Cir. 2010), is not binding, in that case, the United States District Court of the District of Columbia denied the government's motion to dismiss on 12(b)(6) grounds where the Tribe had alleged that the government failed to compensate it fully for indirect CSC despite contractual and statutory obligations. In Menominee, the Secretary asserted that the ISDEAA did not mandate the payment of a specific amount of indirect CSC, and only the contracts created an entitlement to indirect CSC. The court stated that the Secretary's view "represent[ed] a very troubling misapprehension of the statute." Id. The court noted that the ISDEAA "mandates the payment of full indirect CSC and [the ISDEAA] itself establishes that entitlement." Id. (emphasis in original). The court went on to state that the "Secretary is not free to negotiate hard and require the Tribe to accept less than full funding if, as seems likely, the Secretary has more money available," and "[a]lthough the Secretary cannot disburse funds he does not have or amounts in excess of limitations set by Congress, he still has the obligation to fund indirect CSC to the greatest extent possible inasmuch as the statutory promise is full funding." Id. The court further stated that the Secretary did "not seem to appreciate his statutory obligations to fully fund indirect CSC insofar as possible." Id. "No information is provided to the Court concerning how the Secretary 'follow[ed] as closely as possible the allocation plan Congress designed,' . . . when there were insufficient appropriations to allow full funding." Id. (quoting Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1346 (D.C. Cir. 1996)). Thus, the court denied the motion to dismiss, finding that the issue of whether the Secretary breached the self-determination contract by allegedly failing to compensate the Tribe fully for indirect CSC could not be resolved at the motion to dismiss phase. Id.

Likewise, in Council of Athabascan Tribal Governments v. United States, 693 F.Supp.2d 116 (D.D.C. 2010), the district court denied the government's motion to dismiss that was based on the same argument—that the ISDEEA does not mandate the payment of a specific amount of indirect CSC. Quoting Menominee, the court stated that the ISDEAA does create "'statutory obligations to fully fund indirect [contract support costs] insofar as possible,'" and the complaint alleges that the government violated this obligation. Id. at 120 (quoting Menominee, 539 F.Supp.2d at 155). The court, construing the complaint in the light most favorable to the plaintiff, held that since the complaint cited both a contractual and a statutory duty that the

Secretary had breached its agreements with the plaintiff and had violated the ISDEAA's requirement of full payment from available appropriations, the plaintiff had set forth a plausible claim, and therefore denied the motion to dismiss. Id. at 120.

Finally, and most recently, the Supreme Court in its decision in Salazar v. Ramah Navajo Chapter, 132 S.Ct. 2181 (2012), confirmed the full funding mandate, opining that the ISDEAA "mandates that the Secretary shall pay the full amount of contract support costs incurred by tribes in performing their contracts." Id. at 2186 (internal quotations omitted). The Supreme Court recognized the model contract and its reference to the AFAs as a basis for the full amount of CSC, id. at 2187, and found that, "the Government's contractual promise to pay each tribal contractor the 'full amount of funds to which the contractor [was] entitled,' [25 U.S.C.] § 450(g), was therefore binding." Salazar, 132 S.Ct. at 2190-91.

Here, Bristol Bay cites the ISDEAA and its contracts with the government as the source of authority for its claim that the Secretary had a duty to pay the full CSC and to reprogram funds if necessary to do so. To survive a motion to dismiss pursuant to RCFC 12(b)(6) the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). In ruling on a RCFC 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiff. Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). Moreover, as noted above, statutes enacted for the benefit of Indian tribes, such as the ISDEAA, must be liberally construed in their favor. Therefore, this court holds that there is a plausible claim made by plaintiff that survives defendant's motion to dismiss at this juncture.[9]

### 3. Defendant Argues that the Claims for FY 1995 Are Barred by Res Judicata

By way of background, on June 30, 1994, Bristol Bay and IHS negotiated and signed the Alaska Tribal Health Compact ("Compact" or "ATHC"), and an AFA (hereinafter "FY 1995 AFA"), both of which became effective on October 1, 1994. See Def.'s Ex. H at A28-29, A31. On September 29, 1994, Bristol Bay negotiated and signed an Addendum to the FY 1995 AFA. See id. at A32. On December 8, 1994, Bristol Bay filed a claim under the CDA with IHS, "requesting that all funds remaining due and owing, including interest on such funds, be immediately paid to [Bristol Bay]." Id. at A33. On July 7, 1995, Bristol Bay filed suit in the United States District Court for the District of Alaska ("Alaska district court"), alleging breach of the FY 1995 AFA and Addendum, pursuant to the ISDEAA. See id. at A23, A44-45. On September 22, 1995, the parties signed a Settlement Agreement ("Settlement Agreement"), whereby IHS agreed to pay Bristol Bay, inter alia, $506,628 for FY 1995 CSC. See Def.'s Ex. I at A50, A52. Under the terms of the Settlement Agreement, Bristol Bay waived "any and all claims currently before the court." See id. at A50. Pursuant to agreement between the parties, see Ex. J, the Alaska district court dismissed Bristol Bay's case with prejudice. See Def.'s Ex. K.

---

[9] In support of its argument that the government has both a statutory and contractual duty to pay CSC, plaintiff also raises other arguments. The court does not find it necessary to address those.

The government argues that Bristol Bay's claim for FY 1995 for additional indirect CSC costs cannot be considered by this court on the grounds of res judicata. Bristol Bay, however, argues that its claim before the Alaska district court and the claim in this court are not identical, and the claim presented in this action had not accrued at the time the previous action was filed. The court finds that it is not appropriate to decide this motion under RCFC 12(b)(6).

Under the doctrine of res judicata, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981). The purpose of res judicata is "an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled between the parties." Id. at 401. The burden of proof is on the party asserting res judicata. Ammex, Inc. v. United States, 334 F.3d 1052, 1055 (Fed. Cir. 2003) (stating that the party asserting the bar must prove all the elements of the defense). Moreover, in the context of a motion to dismiss, doubts should be resolved in favor of the nonmoving party. See Kearns v. Gen. Motors Corp., 94 F.3d 1553, 1557 (Fed. Cir. 1996) (stating that "precedent weighs heavily against denying litigants a day in court unless there is a clear and persuasive basis for that denial"); Charter Federal Savings Bank v. United States, 87 Fed. Appx. 175, 178 (Fed. Cir. 2004) (stating general rule that doubts are to be resolved against application of res judicata). The party moving for dismissal under res judicata must establish "that (1) the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first." Ammex, 334 F.3d at 1055. Regarding the first element, as defendant notes, Bristol Bay does not dispute that the parties are identical in this suit and the Alaska district court matter.[10] The other elements, however, are disputed, and the most problematic for the government is the third element.

The third element in a res judicata inquiry requires the court to determine whether Bristol Bay's current claim is based on the same set of transactional facts as the Alaska district court case. Defendant argues that the instant case and the prior Alaska district court case stem from the same underlying transaction because Bristol Bay's 1995 Alaska district court lawsuit was based upon the same agreements and the same statutes identified in Bristol Bay's current complaint, i.e., the FY 1995 ATHC, AFA, and accompanying Addendum, and the ISDEAA, and as a result, they "constitute the same claim for res judicata purposes." See Phillips/May Corp. v. United States, 524 F.3d 1264, 1271-72 (Fed. Cir. 2008).

Bristol Bay, however, asserts that there are clear differences between the Alaska district court suit and this suit. Bristol Bay contends that its Alaska district court case "was about the Government failing to promptly pay what was owed in the newly signed compact. Part of the funds that were not paid were tribal shares and the CSC associated with those tribal shares."[11]

---

[10] Other plaintiffs in the 1995 action included the Southeast Alaska Regional Health Corporation and the Maniilaq Association. See Def. Ex. H at A23. These entities are not parties to the instant lawsuit.

[11] Bristol Bay defines "tribal shares" as referring to programs, functions, services, and activities ("PFSAs") associated with the Area Office and Headquarters of the IHS assumed by

- 15 -

Opp'n 36. The claims Bristol Bay settled with the IHS in the Settlement Agreement, it argues, only dealt with a delay in payment of CSC on tribal shares, and did not address the entire shortfall associated with other PFSAs that Bristol Bay carried out in FY 1995. The Settlement Agreement specifies that "[p]ayment of this amount will be made from the FY 1995 Indian Self-Determination (ISD) fund on or before September 30, 1995." Def. Ex. I at A50. The ISD Fund covers startup costs and initial CSC for "new and expanded contracts"—that is, for PFSAs newly assumed from the IHS by a contractor. See Def. Ex. G at A15 (describing ISD Fund as covering cost of initial transfer or additional assumption of programs). Bristol Bay asserts it is clear that the 1995 action sought—and recovered—CSC related solely to new and expanded PFSAs, namely tribal shares. By contrast, plaintiff asserts that the present action seeks to recover damages based on underpayment of indirect costs for ongoing PFSAs, which were not at issue in the 1995 action and do not involve the ISD Fund. Lastly, Bristol Bay argues that the government should not be permitted to assert res judicata in a motion to dismiss because this affirmative defense is not apparent on the face of the pleading. Or in the alternative, Bristol Bay asserts that if the government is to be permitted to pursue this defense, it should be in a summary judgment setting and Bristol Bay should have the opportunity to discover facts bearing on the preclusion argument, such as whether IHS paid installments of indirect cost funding during or even after settlement of the claim pertained to all indirect cost funding for FY 1995.

Defendant challenges the legal theories raised by Bristol Bay. For res judicata purposes, it contends that the fact that Bristol Bay relies on a different legal theory than it did in the Alaska district court case is without consequence. Moreover, defendant argues that Bristol Bay's claim that its current FY 1995 claim and the prior Alaska action are not "identical" misses the point because the relevant question is whether a plaintiff's second claim is based on the same set of transactional facts as the first, and here, Bristol Bay's current FY 1995 claim for CSC is based upon the same agreements and statutory provisions identified in the earlier complaint. Defendant also challenges Bristol Bay's assertion that res judicata does not apply because its current claim had not accrued when that the prior action was filed or settled, because accrual is not an element of res judicata. According to the government, Bristol Bay knew, or should have known, of a potential cause of action for claiming the "full amount of CSC" since at least 1988 when Congress amended the statute, well before Bristol Bay settled the 1995 Alaska lawsuit. Moreover, defendant argues that the 1995 complaint clearly claimed damages for the entire period of the 1995 fiscal year contracts, for all monies due under those contracts, and that the Settlement Agreement made clear that the scope of the agreement encompassed the entire period of "FY 1995."

In deciding this dispute, the court notes that the scope of res judicata of the prior suit must be based, not on the complaint, but the terms of the Settlement Agreement. See Norfolk S. Corp., v. Chevron USA, 371 F.3d 1285, 1288 (11th Cir. 2004). Case law does make clear that

---

Bristol Bay in the Compact and FY 1995 AFA. Tribal shares are apparently one small component of the direct cost base on which indirect costs are owed, a base that also includes hospital and clinic services, alcohol and drug treatment, mental health programs, dental services, health education, and many other PFSAs. For Bristol Bay, the Area and Headquarters tribal shares were funds and associated responsibilities newly assumed in FY 1995.

the parties can reserve the right to litigate a claim that would otherwise be barred by res judicata, but that reservation must be express.  See, e.g., id., 371 F.3d at 1289 ("In determining the res judicata effect of an order of dismissal based upon a settlement agreement, we should also attempt to effectuate the parties' intent.  The best evidence of that intent is, of course, the settlement agreement itself . . . as interpreted according to traditional principles of contract law.").  While the Settlement Agreement does not contain an express reservation of future litigation, plaintiff points out that the terms of the agreement provide that Bristol Bay did preserve all claims not "currently before the court":  "It is the mutual desire of the Indian Health Service (IHS) and Bristol Bay Area Health Corporation to settle their differences currently before the Federal District Court. . . ."  Def. Ex. I, ¶ 1; id. ¶ 7 (stating that Bristol Bay waived "any and all claims currently before the court").  Thus, plaintiff should have the opportunity to discover facts bearing on the preclusion argument—for instance, whether the IHS paid installments of indirect cost funding during or even after settlement of the claim, which would rebut the government's assertion that the settlement agreement pertained to all indirect cost funding for FY 1995.  Defendant's argument may be appropriate in a summary judgment setting but not under RCFC 12(b)(6).  Therefore, the court denies defendant's motion in this respect as well.

## IV.  CONCLUSION

For the reasons discussed above, defendant's motion to dismiss is **denied**.  The parties shall file a joint status report no later than **Thursday, May 9, 2013**, in which they shall propose a schedule for further proceedings.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge