# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 16, 2020            Decided July 23, 2021

No. 19-5336

FORT MCDERMITT PAIUTE AND SHOSHONE TRIBE,
APPELLEE

v.

XAVIER BECERRA, SECRETARY OF HEALTH & HUMAN
SERVICES, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00837)

*Joshua Dos Santos*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Ethan P. Davis*, Acting Assistant Attorney General when the briefs were filed, and *Daniel Tenny*, Attorney.

*Rebecca A. Patterson* argued the cause for appellee. With her on the brief were *Colin C. Hampson* and *Whitney A. Leonard*.

Before: TATEL, MILLETT and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: The Fort McDermitt Paiute and Shoshone Tribe assumed sole control of a medical clinic that the Indian Health Service previously had operated to benefit two different tribes. In determining the clinic's funding, the agency withheld the amount that it had budgeted as benefitting members of the second tribe. The agency also withheld an amount equal to the Medicare and Medicaid reimbursements received from operating the clinic. We hold that the Indian Self-Determination and Education Assistance Act permits the second withholding but not the first.

I

A

The Indian Health Service (IHS), a federal agency within the Department of Health and Human Services, "provide[s] health care services to Indians and Indian tribes." 25 U.S.C. § 1661(a)(1). Congress funds the agency through lump-sum appropriations that grant it considerable discretion "in the proper ordering of its priorities." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993); *see* 25 U.S.C. §§ 13, 1621. The agency uses its funding to administer hospitals and other health programs that provide care to tribal members. *Id.* § 1661(c)(2), (3).

The Indian Self-Determination and Education Assistance Act of 1975 (ISDA) allows Indian tribes to assume control of the health programs that IHS operates on their behalf. Title I of the statute allows tribes to assume control of specific programs by entering self-determination contracts with the federal government. *See* 25 U.S.C. § 5321(a). Title V allows tribes to enter self-governance compacts, which can cover a wider range of programs on a more permanent basis. *See id.* §§ 5384, 5385(b)(2); 1 *Cohen's Handbook of Federal Indian*

*Law* § 22.02 (2019) (compacts provide "significant additional flexibility in program administration").

To form a self-governance compact, a tribe must agree to both a compact and a funding agreement with IHS. 25 U.S.C. §§ 5384(a), 5385(a). The compact must "set forth the general terms of the government-to-government relationship" between the parties. *Id.* § 5384(b). The funding agreement must identify both the programs that the tribe will administer, *id.* § 5385(d)(1), and the funding that IHS will provide, *id.* § 5385(d)(2)(B).

Subject to the availability of appropriations, tribes participating in self-governance are entitled to IHS funding for both "direct program costs" and "contract support costs." 25 U.S.C. § 5388(c). This appeal concerns only direct program costs, which courts have also called the "secretarial amount." *See Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 186 (2012). Under ISDA, the secretarial amount must not be less than what IHS "would have otherwise provided for the operation of the programs or portions thereof" but for the self-governance compact. 25 U.S.C. § 5325(a)(1).

When IHS and a tribe cannot agree on funding, the tribe may submit a final offer to the agency. 25 U.S.C. § 5387(b). IHS then has forty-five days to approve or reject the offer. *Id.* If IHS does not timely reject an offer, "in whole or in part," ISDA deems the agency to have accepted it. *Id.* Upon a partial rejection, IHS must give the tribe "the option of entering into the severable portions of a final proposed compact or funding agreement … that [IHS] did not reject." *Id.* § 5387(c)(1)(D). If IHS rejects a proposed funding amount as too high, the tribe must be allowed to proceed with a "lesser funding amount." *Id.*

In addition to the secretarial amount and contract support costs, Indian health programs may receive income from third

parties, including reimbursements from Medicare and Medicaid for treating their beneficiaries. 42 U.S.C. §§ 1395qq(a), 1396j(a). When IHS operates a health care program, it bills and receives reimbursements from Medicare and Medicaid. *See id.* IHS must place the reimbursements "in a special fund" and use them only as authorized by the Indian Health Care Improvement Act (IHCIA). 25 U.S.C. § 1641(c)(1)(A), (B). When a tribe operates a health care program through a self-governance compact, it may elect to bill for and receive those reimbursements directly. *Id.* §§ 1603(25), 1641(d)(1).

B

The Fort McDermitt Paiute and Shoshone Tribe is a federally recognized Indian tribe with a reservation in parts of Nevada and Oregon. Prior to the events in this case, IHS provided health care to the tribe through a clinic in McDermitt, Nevada, and an accompanying emergency medical services (EMS) program. Most of the clinic's patients are members of the Fort McDermitt tribe or their beneficiaries. Nonetheless, federal law entitles members of other tribes also to receive care at the clinic. 42 C.F.R. § 136.12(a).

In 2016, the Fort McDermitt notified IHS of their intent to assume responsibility for the clinic and a portion of the EMS program. Upon qualifying for self-governance, the tribe submitted to IHS a draft compact and funding agreement. The parties reached an impasse on several issues, including the clinic's secretarial funding. In its final offer to the agency, the tribe requested about $603,000 annually to provide medical care at the clinic. IHS rejected that amount and awarded only about $53,000.

The numbers diverged for two reasons. First, the parties disputed whether the Fort McDermitt were entitled to all the

funds that IHS previously had spent on the clinic or whether the agency could withhold the portion of funds that it previously had allocated to benefit members of another tribe. As a general matter, IHS allocates funding among health care programs according to the number of eligible users who live in the area assigned to each tribe. *See* Indian Health Service, Special General Memorandum 95-02 (Apr. 19, 1995). Applying that standard, IHS funded the clinic to benefit both the Fort McDermitt and the nearby Winnemucca Tribe. In determining the secretarial amount, IHS took the position that it could not include what it described as the Winnemucca's "tribal share" of clinic funding without that tribe's consent.[1] The Fort McDermitt responded that they were entitled to all of the clinic's funding because they would be assuming responsibility for all of its operations.

Second, the parties disputed the treatment of third-party income. Before the Fort McDermitt assumed control of the clinic, IHS collected Medicare and Medicaid payments on the tribe's behalf for treatment that the clinic provided to Medicare and Medicaid beneficiaries. In its final offer, the tribe sought to include the value of those payments in the secretarial amount, even though the tribe now collects the payments from Medicare and Medicaid directly. IHS denied the request.

After IHS refused to fund the clinic at the level requested, the Fort McDermitt entered into the severable portions of its proposed compact and funding agreement. Because the Fort McDermitt had asked to take over the entire clinic, and because IHS did not reject that request, the tribe assumed full control of

---

[1] When IHS and the Fort McDermitt discussed the final offer, the Winnemucca lacked a recognized governing body and thus could not provide consent. Although the tribe now has such a body, it has taken no position in this litigation.

the clinic.  The tribe also filed this lawsuit challenging IHS's refusal to fund the secretarial amount at the level requested.

The district court granted summary judgment to the Fort McDermitt.  It held that the tribe was entitled to all of its requested funding, including amounts that IHS had budgeted for the Winnemucca and amounts obtained through Medicare and Medicaid reimbursements.  *Fort McDermitt Paiute & Shoshone Tribe v. Azar*, No. 17-837-TJK, 2019 WL 4711401 (D.D.C. Sept. 26, 2019).  The government appealed on both issues.

## II

This appeal presents two questions of law, which we review *de novo*.  *See Ramah Navajo Chapter*, 567 U.S. at 193–94.[2]  We first address whether the Fort McDermitt are entitled to all the funds that IHS had previously allocated to the clinic or only to its tribal share of those funds.

## A

Title V of ISDA entitles each tribe participating in self-governance to the same funding that it "would have been entitled to receive under self-determination contracts" governed by Title I, including "amounts for direct program costs specified under section 5325(a)(1)." 25 U.S.C. § 5388(c).  In turn, section 5325(a)(1) provides that funding for direct

---

[2] The Fort McDermitt argue that IHS must support the rejection of its offer by "clear and convincing evidence." 25 U.S.C. § 5387(d).  But "clear and convincing evidence" identifies a burden of persuasion for issues of fact, *see Clear and Convincing Proof*, *Black's Law Dictionary* (6th ed. 1990), and generally has no application to issues of law, *see Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019).

program costs "shall not be less than" what IHS "would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."

These provisions link the secretarial amount to spending on specific healthcare programs, not spending for specific tribes. The secretarial amount must be not less than what IHS would have "provided for the operation of the programs or portions thereof" covered by the self-governance compact or self-determination contract at issue. To "provide" funding means to "supply" or "contribute" it. *Provide*, *Black's Law Dictionary* (6th ed. 1990). So the secretarial amount is keyed to what IHS would have contributed, in dollars and cents, to program operations. Moreover, section 5325(a)(1) allocates funding according to which tribes operate what programs. In the phrase "programs or portions thereof," the words "portions thereof" plainly mean "portions of programs." And in the phrase "operation of the programs or portions thereof," the prepositional phrase "of the programs or portions thereof" plainly modifies "operation." Accordingly, if a tribe operates a portion of a program, it is entitled to receive no less than what IHS would have spent to operate that portion. Section 5325(a)(1) thus fixes the secretarial amount based on programs, or portions of programs, that the tribe *operates*.

This reading of section 5325(a)(1) tracks a broader pattern: whenever ISDA refers to "programs … or portions thereof," context confirms that the portions at issue are portions of program operations. For example, ISDA authorizes tribes to "plan, conduct, and administer [certain] programs or portions thereof, including construction programs." 25 U.S.C. § 5321(a)(1). Because these "portions" can be conducted or administered, they must be portions of operations rather than budgeted funds. Other provisions in ISDA likewise describe portions of programs as concrete projects that can be

performed, administered, redesigned, consolidated, or delegated. *See id.* §§ 5385(d)(1), 5386(e), 5387(c)(1)(A)(ii). Because the phrase "programs … or portions thereof" consistently bears this meaning throughout ISDA, we presume that it also does so in section 5325(a)(1). *See Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007).

Here, it is undisputed that the Fort McDermitt have assumed responsibility for all health care programs at the clinic. The tribe is thus entitled to all the funding that IHS would have spent to operate the clinic absent the compact. IHS therefore erred in withholding funds that it had internally allocated to benefit the Winnemucca.

B

IHS argues that section 5325(a)(1) entitles tribes to only their "tribal share" of a program's funding. To support this view, the agency reads the phrase "portions thereof" in section 5325(a)(1) to refer to different tribes' relative shares of eligible users. For the clinic here, IHS says that it has allocated tribal shares to both the Fort McDermitt and the Winnemucca. So, IHS argues, it cannot transfer the Winnemucca share without that tribe's consent.

This position is incompatible with ISDA's text. To reiterate, section 5325(a)(1) links the secretarial amount to what the agency would have "provided for the *operation* of the program or portions thereof" (emphasis added). IHS reads "portions" to mean tribal shares, but the statute makes clear that the relevant portions are simply portions of programs that individual tribes operate.

ISDA's structure further cuts against reading a concept of tribal shares into section 5325(a)(1). Title V of ISDA contains a definition of "tribal share" that by its terms applies only "[i]n

this subchapter"—*i.e.*, in Title V.  25 U.S.C. § 5381(a), (a)(8). But section 5325(a)(1) appears in Title I, which neither defines "tribal share" nor uses that phrase for any purpose.  And the "tribal share" definition is unhelpful to IHS in any event.  Title V defines a "tribal share" as an "Indian tribe's portion of all funds and resources that support secretarial programs, services, functions, and activities (or portions thereof) that are not required by the Secretary for performance of inherent federal functions."  *Id.* § 5381(a)(8).  Although this definition divides secretarial funds into tribal portions, it also distinguishes portions of *funds* from portions of *programs*.  And as explained above, section 5325(a)(1) references only portions of programs in fixing the secretarial amount.

Moreover, a different ISDA provision apportions funding based on tribal shares.  ISDA allows tribes to jointly assume control of a program through an inter-tribal consortium.  25 U.S.C. § 5381(a)(5).  It also allows tribes to withdraw from a consortium and then to operate a portion of the program independently.  *Id.* § 5386(g)(1)(A).  In that event, ISDA entitles a withdrawing tribe to the "tribal share of funds and resources" that support the "programs … or portions thereof" that it will operate independently. *Id.* § 5386(g)(2)(A).  Section 5386(g)(2)(A) thus expressly divides funding according to a "tribal share" of the relevant program or portions, which confirms that section 5325(a)(1) does not do so by implication. *See Russello v. United States*, 464 U.S. 16, 22–23 (1983).

Against all this, IHS invokes section 5385(b)(1), which requires each funding agreement to "authorize" self-governing tribes to "receive full tribal share funding, including tribal shares of discretionary [IHS] competitive grants" for every program identified in their compacts.  25 U.S.C. § 5385(b)(1). The agency reads this language to limit tribes' secretarial funding to tribal shares as determined by their relative eligible

beneficiaries. But Title V of ISDA defines a "tribal share" to mean only a tribe's "portion" of program funds, without elaborating on whether it should reflect the tribe's relative number of *beneficiaries* or its relative responsibility for program *operations*. *Id.* § 5381(a)(8). Full "tribal share funding" is thus consistent with a secretarial amount based on program operations. Moreover, section 5385(b)(1) concerns the overall funding that tribes must be authorized to receive, including the mandatory secretarial amount and additional discretionary grants. Authorizing *at least* tribal-share funding for *all* these amounts does not imply that the secretarial amount includes *no more* than tribal-share funding. In any event, a provision that generally governs all funding cannot control over another one that specifically defines the secretarial amount. So, if there were a conflict between the broad authorization of "tribal share funding" in section 5385(b)(1) and the specific entitlement to the secretarial amount in section 5325(a)(1), the latter would control. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384–85 (1992).

C

IHS further argues that our reading of section 5325(a)(1) would allow individual tribes to operate and claim funding for multi-tribe programs without consent from all affected tribes. IHS contends that our reading thus violates two other ISDA provisions, sections 5304(*l*) and 5383(c)(1)(B) of Title 25. More generally, IHS worries that our reading is unfair to non-consenting tribes such as the Winnemucca.

ISDA protects objecting tribes through several provisions, including the two cited by IHS, that govern which program operations any one tribe may assume. First, if a tribe seeks to contract for a program "benefitting more than one Indian tribe," all of those tribes must consent. 25 U.S.C. § 5304(*l*). Second,

to qualify for self-governance, a tribe must "request[] participation" from each tribe "to be served" in its self-governance compact. *Id.* § 5383(c)(1)(B). Third, if one tribe seeks partial control of a multi-tribe program, ISDA permits IHS to "divide the administration" of the program, but only if the agency takes "such action as may be necessary to ensure that services are provided" to the other affected tribes, "including program redesign in consultation with" those tribes *Id.* § 5324(i)(1). Fourth, ISDA permits tribes to join and withdraw from inter-tribal consortiums, *id.* § 5386(g)(2)(A), which it defines as coalitions of "separate Indian tribes that join together for the purpose of participating in self-governance," *id.* § 5381(a)(5). And if a tribe withdraws from an inter-tribal consortium, it is "entitled to its tribal share of funds" supporting programs that the tribe will operate under its own contract or compact, "calculated on the same basis as the funds were initially allocated in the [consortium's] funding agreement." *Id.* § 5386(g)(2)(A). For secretarial funding, this means that a withdrawing tribe may receive funding that IHS would have provided for portions of programs that the withdrawing tribe will operate prospectively. *Id.* § 5325(a)(1).

These provisions allow individual tribes to protect their individual interests in program control and funding. Sections 5304(*l*) and 5383(c)(1)(B) allow each tribe that benefits from a program to block another tribe from assuming its control. And because ISDA bases program funding on program control, that in turn allows each tribe to protect its relative claim to a program's funding. Section 5324(i)(1) permits IHS to divide program administration to account for different tribes taking different positions on self-governance, but only if IHS accounts for the interests of all affected tribes. Finally, section 5386(g)(2)(A) permits tribes to band together or split apart for purposes of operating tribal programs, and it preserves the ability of a withdrawing tribe to receive its share of funds

necessary to support programs that it will operate going forward. ISDA thus gives individual tribes a significant say in the operation and funding of multi-tribe programs.[3]

In this unusual case, IHS did not obtain the Winnemucca's consent before transferring full control of the clinic to the Fort McDermitt. Nor did the agency divide administration of the clinic. Nonetheless, those omissions have no bearing on the funding question before us. Section 5304(*l*), which requires consent for one tribe to assume responsibility for "services benefitting more than one Indian tribe," governs operations as opposed to funding. Because IHS agrees that the Fort McDermitt may operate the entire clinic, that issue is not properly before us. Likewise, section 5383(c)(1)(B) defines only the "qualified applicant pool" for self-governance, but IHS agrees that the Fort McDermitt are so qualified. Finally, section 5324(i)(1) allows severance only when "require[d]" by the governing contract or compact. And IHS agrees that the compact in this case authorizes the Fort McDermitt to operate the entire clinic. In short, although ISDA allows individual tribes to influence program operations, which in turn affects secretarial funding, it does not allow IHS to withhold funds that the agency would otherwise have provided for operations that it allows a tribe to undertake. On the funding question at issue here, section 5325(a)(1) is controlling, and the other provisions invoked by IHS are inapposite.

---

[3] These provisions do not elaborate on which tribes "benefit[]" from a program, 25 U.S.C. § 5304(*l*); which tribes are "served" by a self-governance compact, *id.* § 5383(c)(1)(B); how IHS may "divide" program "administration," *id.* § 5324(i)(1); or how it may calculate "tribal share[s]," *id.* § 5386(g)(2)(A). We need not address how much discretion these terms give IHS in deciding how to allocate control of and funding for multi-tribe programs.

IHS's concerns about fairness to the Winnemucca are misplaced. Members of that tribe historically received care at other facilities; only two members of the tribe used the clinic in the entire year before the Fort McDermitt began to operate it; members of thirty-three other tribes used the clinic during that same period, without any suggestion that any of those tribes could veto the Fort McDermitt's compact; and the Winnemucca, despite now having a recognized governing body and thus the legal capacity to act as a tribe, have lodged no objection to the Fort McDermitt's position. Moreover, the Winnemucca are not without protections going forward. For one thing, they could seek to set aside IHS's transfer of clinic operations to the Fort McDermitt, on the theory that it violated either section 5304(*l*) or section 5383(c)(1)(B). Alternatively, they could seek to form an inter-tribal consortium with the Fort McDermitt to jointly run the clinic. In any event, the Winnemucca may continue to use the clinic on the same terms as the Fort McDermitt. 42 C.F.R. § 136.12(a).

In closing, we note that there is a good reason why ISDA matches program funding to program operations: by granting each self-governing tribe what IHS "would have otherwise provided" for programs run by the tribe, section 5325(a)(1) guarantees the programs a proxy for adequate funding. The same is not true under IHS's reading of ISDA, which, in cases like this one, would permit the agency to give clinics fewer resources than what it had previously deemed necessary to run them itself.

\* \* \* \*

To recap, the secretarial amount under section 5325(a)(1) depends on the portions of programs that a tribe operates under a self-determination contract or self-governance compact. And because the Fort McDermitt are now responsible for operating

14

the entire clinic, the tribe is entitled to all the funding that IHS would have otherwise provided for its operation, without any deduction based on tribal shares. We affirm the district court on this issue.[4]

### III

We now address whether the secretarial amount must include the value of Medicare and Medicaid reimbursements that IHS previously had collected on behalf of the Fort McDermitt, even though the tribe now collects the reimbursements directly. The Fort McDermitt argue that the secretarial amount includes these reimbursements because, had they not entered into a self-governance compact, IHS would have provided them with the reimbursements. We disagree.[5]

To begin, the secretarial amount reflects what IHS would otherwise have "provided" for clinic operations, but IHS does not "provide" Medicare and Medicaid reimbursements within the ordinary meaning of that term. As noted above, to

---

[4] Given this disposition, we do not reach the Fort McDermitt's alternative argument that the Winnemucca, whose members used the clinic only twice in one year, lack any tribal share in it.

[5] The Fort McDermitt argue that IHS forfeited this objection by failing to raise it in its rejection letter. But although the letter agreed to make a "one-time transfer" of pending Medicare and Medicaid reimbursements, it also refused to make those reimbursements "recurring" in the future, thereby preserving the objection that IHS raises here. J.A. 122. The tribe further argues that the rejection letter is deficient for failing to identify the specific amount of funding associated with this issue. But ISDA requires the agency to show only that "the amount of funds proposed in the final offer exceeds the applicable funding level to which the Indian tribe is entitled." 25 U.S.C. § 5387(c)(1)(A)(i). The merits of the Medicare and Medicaid reimbursement issue are thus properly before us.

"provide" means to "supply" or "contribute." *Provide*, *Black's Law Dictionary*, *supra*. Tribes are "entitled" to those payments under the Social Security Act, 25 U.S.C. § 1641(c)(1)(A), and can collect them directly from the Centers for Medicare and Medicaid Services, *id.* § 1641(d)(1). Moreover, when IHS collects the payments for a tribe, it functions only as a trustee, holding the payments in a "special fund" and spending them under specific statutory criteria. *Id.* § 1641(c)(1)(A), (B). Either way, CMS supplies and contributes the payments.

ISDA also expressly excludes third-party income from the secretarial amount. Section 5388(j) provides that "all Medicare [or] Medicaid … income earned by an Indian tribe shall be treated as supplemental funding to that negotiated in the funding agreement." 25 U.S.C. § 5388(j). A "supplement" is "[s]omething added to complete a thing, make up for a deficiency, or extend or strengthen the whole." *Supplement*, *American Heritage Dictionary* (4th ed. 2000). Because income from third parties is "supplemental" to the funds negotiated in a funding agreement, it must be separate from those funds. And because the negotiated funds include the secretarial amount, section 5388(j) requires IHS to calculate that amount separately from third-party income.

The district court reasoned that section 5388(j) concerns only how funds are "transferred *after* the parties have entered into the funding agreement." *Fort McDermitt Paiute*, 2019 WL 4711401, at *8. But section 5388(j) designates all third-party income as supplemental, without any limit to post-formation transfers as opposed to pre-formation negotiations. Moreover, it states that third-party income may not result in "any offset or reduction in the amount of funds the Indian tribe is authorized to receive"—and thus specifically controls the terms of funding agreements. Because section 5388(j) thus governs the negotiation of funding agreements, its designation

of third-party income as "supplemental" excludes that income from the secretarial amount.

The structure of IHCIA reinforces this conclusion. As described above, IHCIA allows tribes to receive third-party income in two ways. IHS can collect that income on tribes' behalf, hold it in a "special fund," and then disburse it under specific statutory criteria. 25 U.S.C. § 1641(c)(1)(A), (B). Or, tribes participating in self-governance may elect to bill for and receive the income directly. *Id.* §§ 1603(25), 1641(d)(1). IHCIA makes these two methods mutually exclusive; when a tribe elects to collect the income directly, the provisions allowing IHS to collect and disburse the funds on the tribe's behalf "shall not apply," and the tribe ceases to be eligible for payments from its IHS "special fund" for services provided "during the period of such election." *Id.* § 1641(c)(2). IHCIA thus plainly bars tribes from recovering twice for services provided to Medicare and Medicaid beneficiaries. And we decline to adopt a strained interpretation of ISDA that would allow precisely that double-dipping.

As a last resort, the Fort McDermitt invoke the interpretive canon that statutes must "be construed liberally in favor of the Indians." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). As codified in ISDA, the canon applies only when a statute is ambiguous. 25 U.S.C. § 5392(f). For the reasons set forth above, we conclude that ISDA's text and structure unambiguously exclude the value of Medicare and Medicaid reimbursements from the secretarial amount.

IV

The final issue is one of remedy. Because we affirm the district court on the tribal-share issue, the Fort McDermitt are entitled to receive funds that IHS withheld on that basis. However, the record does not clearly identify that amount. In

the proceedings below, the district court remarked that the parties had not identified "the applicable funding amount associated with each legal issue in dispute." ECF 24, at 4–5. The parties responded by stipulating that the secretarial amount should increase by $551,279 if the Fort McDermitt prevail on both issues before us. But there was no stipulation as to the appropriate additional amount if the tribe prevailed on only the tribal-share issue. Because the record is unclear on that point, we remand the case for the district court to resolve it in the first instance.

## V

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

*So ordered.*